**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
FRED SPAGNOLA, individually and on behalf of   :
all those similarly situated,      :
  :
      Plaintiff,   :
  :
    -against-   :
  :
THE CHUBB CORPORATION, FEDERAL   :     **06 Civ. 9960 (HB)**
INSURANCE COMPANY, GREAT NORTHERN   :
INSURANCE COMPANY, JOHN D. FINNEGAN   :
and THOMAS F. MOTAMED,   :
  :
      Defendants.   :
------------------------------------------------------------------------x     **OPINION & ORDER**
JONATHAN A. BERNSTEIN, individually and on   :
behalf of all those similarly situated,   :
  :
      Plaintiff,   :
  :
    -against-   :
  :
THE CHUBB CORPORATION, FEDERAL   :     **08 Civ. 193 (HB)**
INSURANCE COMPANY, GREAT NORTHERN   :
INSURANCE COMPANY, JOHN D. FINNEGAN   :
and THOMAS F. MOTAMED,   :
  :
      Defendants.   :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., United States District Judge:**

      The Plaintiffs in these putative class actions – Fred Spagnola ("Spagnola") and Jonathan A. Bernstein ("Bernstein") (collectively, "Plaintiffs") – seek damages and injunctive relief from The Chubb Corporation ("Chubb"), Federal Insurance Company ("FIC"), Great Northern Insurance Company ("Great Northern") (collectively, "Defendants")[1] based on alleged wrongful conduct related to Plaintiffs' and the putative class's homeowners' insurance policies and following a remand from the Court of Appeals. Before the Court are Defendants' Motion to Dismiss, Defendants' Motion to Deny Class Certification and Plaintiffs' Motion to Strike Certain Portions of Defendants' Motion to Deny Class Certification. For the reasons set forth below,

---

[1] Plaintiffs both initially also sued John D. Finnegan, who is President, CEO and Director of Chubb and the Chairman of the Board and CEO of FIC, and Thomas F. Motamed, Vice Chairman and COO of Chubb and President of FIC (the "Individual Defendants"). However, by Notice of Voluntary Dismissal dated December 11, 2009 and Stipulation dated December 30, 2009, respectively, Bernstein and Spagnola have agreed to dismiss their claims against the Individual Defendants.

Defendants' Motion to Dismiss is granted in part and denied in part, Defendants' Motion to Deny Class Certification is granted, and Plaintiffs' Motion to Strike is denied.[2]

# I  FACTUAL BACKGROUND[3]

Spagnola and his wife purchased a Masterpiece homeowner's insurance policy (the "Policy") issued by Great Northern for a one-year term in 2001. The Masterpiece Policy offered three different types of coverage: (1) an "extended replacement cost" policy, in which the insurer pays the cost of reconstruction even if the cost exceeds the amount of the insured's coverage, (2) a "verified replacement cost" policy, in which the insurer pays the reconstruction cost only up to the specified amount of coverage and (3) a "conditional replacement cost" policy, in which the insurer pays only a portion of the reconstruction costs that cannot exceed the amount of coverage. Spagnola's Policy was an extended replacement cost policy and expressly stated that Great Northern would pay the costs of reconstruction "even if this amount is greater than the amount of coverage shown in [Spagnola's] policy." The amount of coverage was listed in the Policy's Coverage Summary and during each annual policy period, the Summary indicated that the coverage amount "will be increased daily to reflect the current effect of inflation. At the time of a covered loss, your amount of house coverage will include any increase in the United States Consumer Price Index from the beginning of the policy period." The coverage amount could be changed "when appraisals are conducted and when the policy is renewed, to reflect current costs and values." The term "current costs and values" is not further defined in the Policy. For five consecutive years, Spagnola renewed his Policy and paid each year's increased premium.

Bernstein purchased an extended replacement cost homeowners' policy in 1988 for his Park Avenue apartment and renewed it 17 times until 2006. He also purchased an extended replacement cost policy for a house he built in East Hampton in 1999. The terms of Bernstein's homeowner's policies were identical to those contained in Spagnola's Policy. Upon switching carriers in 2006,[4] Bernstein learned that both properties were underinsured.

---

[2] The class certification motion was fully submitted on December 3, 2009 and oral argument was held on that day. The Motion to Dismiss and Motion to Strike were fully submitted on December 24, 2009. Although the parties have requested oral argument on the latter two motions, upon a review of the motion papers, the Court has determined that oral argument will not be necessary and will proceed to resolve the motions on the papers.

[3] The facts that underlie Spagnola's Complaint were discussed in detail in this Court's March 27, 2007 Opinion and Order ("*Spagnola I*"), 2007 WL 927198, at *1 (S.D.N.Y. Mar. 27, 2007), and will be repeated here only to the extent necessary to resolve the instant motions. Bernstein's Complaint, filed January 9, 2008, is substantially identical to Spagnola's Complaint; any differences, to the extent relevant, will be discussed herein.

[4] Bernstein's reasons for switching insurance carriers are unrelated to the instant lawsuits.

Great Northern, the insurer with which both Spagnola and Bernstein contracted to obtain their respective Policies, is one of several insurance companies within the "Chubb Group of Insurance Companies" (the "Chubb Group"). The Chubb Corporation is the parent corporation of each of the insurers in the Chubb Group. FIC is the largest of the insurance companies within the Chubb Group and manages the other companies.

Plaintiffs allege that the Chubb Corporation established the uniform contract language and practices that were part and parcel of the Masterpiece Policies that form the basis of these actions and provided "material assistance in the perpetration of the wrongs" complained of and that "participation in the creation of the contracts and practices with respect to their implementation make [ ] it a party to the policies between [Plaintiffs and Great Northern]." Plaintiffs allege that, among other things, Chubb, FIC and Great Northern have a significant overlap in directors and senior management and share a principal place of business, and that certain key documents and agreements indicate that Chubb and its subsidiaries are sometimes referred to as a single entity. Plaintiffs also allege that the cover letter that is transmitted to insureds with the Masterpiece Policies is sent from Chubb, not Great Northern; that a coordinated marketing and advertising scheme refers only to Chubb and not its insurance subsidiaries; and each Masterpiece Policy bears the Chubb logo and directs insureds to make inquiries to Chubb at its place of business in New Jersey or by email at "___@Chubb.com."

## II. PROCEDURAL HISTORY

Spagnola's action was removed from New York Supreme Court, New York County to this Court on October 19, 2006. Spagnola filed an amended complaint on November 30, 2006 and subsequently filed yet another amended complaint on December 29, 2006 (the "First Amended Federal Complaint"). The First Amended Federal Complaint alleged five separate causes of action: (1) breach of contract;[5] (2) violation of N.Y. Insurance Law § 3425; (3) violation of N.Y. General Business Law § 349; (4) unjust enrichment and (5) injunctive relief. On January 19, 2007, Defendants moved to dismiss the First Amended Federal Complaint, arguing, among other things, that none of Spagnola's claims stated a cause of action upon which relief could be granted, and that all claims against Defendants other than Great Northern should be dismissed because Great Northern was the only party with which Spagnola had contracted. On March 27, 2007, this

---

[5] The breach of contract claim was based on three different premises: to wit, that Defendants improperly increased coverage and premiums (1) without consent of the insured, (2) in excess of the Consumer Price Index ("CPI"), and (3) in violation of N.Y. Insurance Law § 3425.

Court granted Defendants' motion in its entirety. Because the Court agreed that Spagnola's causes of action were unsustainable, it did not reach the alternative question of whether the Defendants other than Great Northern should be dismissed.

Spagnola appealed, but while that appeal was pending, his counsel filed a separate complaint on behalf of Plaintiff Bernstein. As noted, the Bernstein Complaint is identical to the Spagnola Complaint in all material respects, and alleges the same causes of action against the same Defendants. The only differences between the Bernstein and Spagnola Complaints are the years and amounts of coverage obtained in their respective extended replacement cost Masterpiece Policies. Bernstein's case was assigned to Judge Paul A. Crotty, but the parties stipulated to a stay of that action pending the outcome of Spagnola's appeal.

On July 28, 2009, the U.S. Court of Appeals for the Second Circuit affirmed the dismissal of Spagnola's Complaint in all respects except one: relying on a recent decision of the Appellate Division, the court found that Spagnola's breach of contract claim would survive the motion to dismiss, but only to the extent that it was based on the increase in coverage and premiums "in a way that did not reflect current costs and values." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 71-72 (2d Cir. 2009) (following *Beller v. William Penn Life Ins. Co. of N.Y.*, 8 A.D.3d 310 (2d Dep't 2004)). The Second Circuit also found that the voluntary payment doctrine – which "precludes a plaintiff from recovering payments 'made with full knowledge of the facts' and with a 'lack of diligence' in determining his contractual rights and obligations'" – did not bar Spagnola's claim at the motion to dismiss phase. *Id.* at 72-73. That is, while the court acknowledged that "the voluntary payment doctrine may ultimately bar Spagnola's breach of contract claim," it nonetheless held that "it is too early in this case to conclusively answer that question." *Id.* at 73. Accordingly, the Second Circuit remanded the Spagnola case for further proceedings on the breach of contract claim insofar as it was premised on Defendants' alleged failure to change coverage according to "current costs and values."

After remand, the Bernstein action was reassigned from Judge Crotty to the undersigned, and the actions were coordinated for the purposes of discovery, motion practice and trial. The Court held a Rule 16 conference in both actions on October 30, 2009, entered a Pretrial Scheduling Order and set a briefing schedule on any anticipated motions. Defendants filed their Motion to Deny Class Certification on November 20, 2009 and filed their Motion to Dismiss on November 30, 2009. Plaintiffs have moved to strike an affidavit that Defendants submitted in support of their class certification motion, as well as certain portions of the motion papers

themselves.  Plaintiffs contend that those materials address the merits of the action and not class certification, and as such should not be countenanced.

### III.  MOTION TO DISMISS

While Defendants' Motion to Dismiss is multi-faceted on its face, the ultimate goal of the motion is to telescope both the Bernstein and Spagnola actions and to limit each to a single claim – breach of contract based on an alleged failure to increase premiums and coverage in accordance with "current costs and values" – against a single defendant, Great Northern.  In their efforts to achieve that end, Defendants move to dismiss (1) all claims from the Bernstein action whose dismissal was affirmed by the Second Circuit in *Spagnola*, (2) all claims against the Individual Defendants in both actions,[6] and (3) all claims against Chubb and FIC for failure adequately to plead (a) alter-ego liability, (b) agency theory, or (c) standing.  As will be discussed below, Plaintiffs do not appear to dispute the first two of these contentions.  With respect to Chubb and FIC, however, Plaintiffs argue that, although they are not named in the Policies at issue, they may be sued on the basis of an alter-ego and/or agency theory.[7]  Each of these contentions will be addressed in turn.

### A.  Legal Standard on Motion to Dismiss

The Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and, more recently, *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009), articulated the standards that apply to Defendants' motion to dismiss pursuant to Rule 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The Court must accept all factual allegations as true, but this requirement does not apply to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Id.*  The court's determination of whether a complaint states a "plausible claim for relief" is a "context-specific inquiry" that requires application of

---

[6] As noted, this portion of Defendants' Motion to Dismiss has been mooted by Bernstein's Notice of Voluntary Dismissal and Spagnola's stipulation with Defendants.

[7] In their opposition to the motion to dismiss, Plaintiffs allege for the first time that Chubb and FIC may be sued on a breach of contract claim under a "*de facto* contract" theory.  Plaintiffs have never before advanced this particular theory, and have cited to no authority to support it.  Accordingly, the Court cannot retain Chubb or FIC in these actions on this theory of liability.

"judicial experience and common sense." *Id.* Unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

In deciding a motion to dismiss, the Court may consider documents attached as exhibits to the complaint or incorporated into the complaint by reference, documents that are integral to the plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken. *See* Fed. R. Civ. P. 10(c); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992); *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991); *Thomas v. Westchester County Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). When documents are integral, known of and possessed by the plaintiff, and there is no dispute as to their authenticity, the Court may consider them on a motion to dismiss. *Thomas*, 232 F. Supp. 2d at 276 (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 705 & n.4 (9th Cir. 1998); *Cortec*, 949 F.2d at 48).[8]

**B.      Claims Dismissed from Spagnola's Complaint are Likewise Dismissed from Bernstein's Complaint**

Among other things, Defendants moved to dismiss all causes of action from Bernstein's Complaint whose dismissal from Spagnola's Complaint has now been affirmed by the Second Circuit. To wit, Defendants seek to dismiss Count I (violation of New York Insurance Law § 3425), Count III (deceptive trade practices under New York General Business Law § 349), Count IV (unjust enrichment) and Count V (injunctive relief). Defendants also argue that Bernstein's breach of contract claim (Count II) should be dismissed to the extent it advances any theory of liability other than that Bernstein's coverage was increased in a manner that did not comport with "current costs and values." After Defendants filed their Motion to Dismiss, but before it was fully submitted, Bernstein filed a Notice of Voluntary Dismissal that dismissed "all claims other than Count II." Accordingly, Plaintiffs contend that this portion of Defendants' motion is moot. However, to the extent that the Notice of Voluntary Dismissal did not explicitly limit Count II to the theory on which the Second Circuit permitted Spagnola's claim to proceed, it did not moot the motion. As each of the causes of action in Bernstein's Complaint that Defendants seek to dismiss

---

[8] In opposition to the Motion to Dismiss, Plaintiffs attempt to circumvent the rule against the consideration of materials outside the four corners of the Complaints by relying, in part, on facts garnered in discovery thus far. This tactic must be rejected, as the Court must only consider the allegations of the Complaints and any extrinsic documents that are integral thereto. Thus, any citation to outside discovery materials will be disregarded.

is identical to the claims whose dismissal was affirmed by the Second Circuit in Spagnola's case, they must be dismissed, and the only cause of action in *Bernstein* that may proceed is the breach of contract claim insofar as it is based on "current costs and values."

## C.  Chubb and FIC as Defendants

It is an elementary principle of contract law that no claim for breach of contract can lie where there exists no contract between the parties. *See, e.g.*, *National Market Share, Inc. v. Sterling Nat'l Bank, Inc.*, 392 F.3d 520, 525 (2d Cir. 2004).  As the only party with which either of the Plaintiffs contracted in obtaining their Masterpiece Policies was Great Northern, and no contract is alleged to exist between Plaintiffs and either Chubb or FIC, Defendants seek dismissal of Chubb and FIC from this action.  The Court agrees that, unless Plaintiffs have adequately alleged the existence of alter-ego liability or actual or apparent authority under an agency theory based on the relationship between Great Northern and Chubb and/or FIC, no claim for breach of contract can be sustained against these non-contracting Defendants.[9]

### 1.  *Alter-Ego Liability*[10]

As an initial matter, Plaintiffs appear to argue categorically that the issue of whether the corporate veil should be pierced so as to impose liability on a corporate alter-ego is an inherently factual question and that "motions to dismiss these claims are not granted pre-discovery."

---

[9] While Plaintiffs do not claim to bring their claim against Chubb or FIC under a theory of civil conspiracy, it is nonetheless worth noting that no such cause of action can be sustained under New York law.  *See, e.g.*, *Lehman v. Garfinkle*, 08 Civ. 9385 (SHS) (DF), 2009 U.S. Dist. LEXIS 84686, at *24-25 (S.D.N.Y. Aug. 24, 2009) (rejecting claim of conspiracy to breach contract because "New York law does not recognize such a theory of liability") (citing *Smith v. Fitzsimmons*, 180 A.D.2d 177, 178 (4th Dep't 1992) ("There is no substantive tort of civil conspiracy; thus, there cannot be any cause of action for conspiracy to breach [a] contract.")).

Additionally, it should go without saying – but apparently it does not – that Plaintiffs lack standing to bring any claims against Chubb or FIC that are based on the issuance of homeowners' insurance policies by any insurance subsidiary other than Great Northern.  That is, Plaintiffs having purchased their policies from Great Northern only, they cannot show any injury based on any alleged conduct by any other insurer.  *See, e.g.*, *Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005).  "The filing of a suit as a class action does not relax [the] jurisdictional requirement" of standing on the part of the named plaintiffs.  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006); *see also O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).  Thus, to the extent Chubb or FIC have any potential liability in this action at all, such liability must be a factor of those companies' relationship to Great Northern, and with no other company.

[10] In an action based on diversity of citizenship, the Court must apply the law of the state in which it sits, including that state's choice-of-law principles.  *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 175 (2d Cir. 2000) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *see also White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006); *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1538-39 (2d Cir.), *cert. denied*, 522 U.S. 864 (1997).  Under New York choice-of-law principles, the issue of whether the corporate veil may be pierced is determined under the law of the state of incorporation.  *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995).  Here, the parties agree that the veil-piercing inquiry must be examined under both Minnesota and Indiana law, as Great Northern was initially incorporated under Minnesota law, until it was reincorporated on November 28, 2007 under the laws of Indiana.  *See* Kirby Aff. ¶ 10(C) and Ex. 5.  As the Complaints allege both pre- and post-reincorporation conduct, the law of both states must be applied.

Plaintiffs are mistaken in this regard, as courts routinely consider, and grant, motions to dismiss for failure adequately to allege facts sufficient to support the imputation of liability on an alleged alter-ego. *See, e.g.*, *G4S Justice Servs., Inc. v. Correctional Program Servs., Inc.*, 07-cv-00945-JMS-SEB, 2009 U.S. Dist. LEXIS 88689, at *3-4 (S.D. Ind. Sept. 25, 2009); *Masterson Personnel, Inc. v. McClatchy Co.*, Civ. No. 05-1274 (RHK/JJG), 2005 U.S. Dist. LEXIS 29565, at *17-18 (D. Minn. Nov. 22, 2005); *SICK, Inc. v. Motion Control Corp.*, Civil No. 01-1496 (JRT/FLN), 2003 U.S. Dist. LEXIS 10612, at *28 (D. Minn. June 19, 2003); *Group Health Plan, Inc. v. Philip Morris Inc.*, No. 98-1036 (PAM/JGL), 1999 U.S. Dist. LEXIS 9640, at *18-19 (D. Minn. Apr. 1, 1999).

In both Minnesota and Indiana, alter-ego liability is only rarely imposed and is seen as a "severe" remedy used only in the most compelling circumstances. *See, e.g.*, *Escobedo v. BHM Health Assocs., Inc.*, 818 N.E.2d 930, 933 (Ind. 2004) (noting that limited shareholder liability is a "bedrock" principle of corporate law and finding "the burden on a party seeking to 'pierce the corporate veil' is severe"); *Groves v. Dakota Printing Servs., Inc.*, 371 N.W.2d 59, 62 (Minn. Ct. App. 1985) (finding that "[l]imited liability for shareholders of corporations is the general rule" and "[p]iercing the corporate veil is an exception to be used only under limited circumstances"); *see also Parks v. McNeilus Cos., inc.*, Civil No. 02-4733 (PAM/JSM), 2004 U.S. Dist. LEXIS 3230, at *7 (D. Minn. Mar. 3, 2004) (finding courts "must begin with the general presumption that absent fraud or bad faith, a corporation will not be held liable for the acts of its subsidiaries") (quoting *Association of Mill & Elevator Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d 446, 449 (Minn. Ct. App. 1996)).  To properly plead alter-ego liability under Minnesota law, a plaintiff must meet two requirements: first, it must plead that the relationship between the shareholder and the corporation is such that the corporation was not operated as a separate legal entity; and second, that to shield the shareholder from liability would result in "injustice or fundamental unfairness." *Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., Inc.*, 283 N.W.2d 509, 512 (Minn. 1979); *see also Trustees of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719, 730-31 (8th Cir. 2008) (applying Minnesota law). Similarly, under Indiana law, a plaintiff must plead (1) that "the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another," and (2) "that the misuse of the corporate form would constitute a fraud or promote injustice." *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994).

To satisfy the first prong of the analysis, plaintiffs may rely upon several "significant" factors, including (1) insufficient capitalization for purposes of corporate undertaking, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of debtor corporation at the time of the transaction in question, (5) siphoning of funds by the dominant shareholder, (6) nonfunctioning of other officers and directors, (7) absence of corporate records, and (8) the existence of the corporation as a mere façade for individual dealings. *Victoria Elevator*, 283 N.W.2d at 512; *Aronson*, 644 N.E.2d at 687. To survive a motion to dismiss, a plaintiff must allege that "a number of these factors [are] present." *Victoria Elevator*, 283 N.W.2d at 512.[11] To satisfy the second prong of the inquiry, "proof of strict common law fraud is not required, but, rather, evidence that the corporate entity has been operated as a constructive fraud or in an unjust manner must be presented." *Groves*, 371 N.W.2d at 62-63 (quoting *White v. Jorgenson*, 322 N.W.2d 607, 608 (Minn. 1982)); *see also Extra Energy Coal Co. v. Diamond Energy & Res., Inc.*, 467 N.E.2d 439, 441-42 (Ind. Ct. App. 1984) ("Indiana courts are reluctant to disregard corporate identity and do so only to protect innocent third parties from fraud or injustice when transacting business with a corporate entity."); *cf. Cooper v. Lakewood Eng'g & Mfg. Co.*, 874 F. Supp. 947, (D. Minn. 1994) ("Minnesota law is clear that the plaintiff's misfortune of being deprived of a potentially liable party is not, standing alone, an injustice. An 'injustice' warranting the equitable remedy of piercing the corporate veil exists only when the subsidiary was operated as a . . . constructive fraud or in an unjust manner.").

It is incumbent upon Plaintiffs to plead sufficient facts to support both prongs of the veil-piercing inquiry – that is, both disregard for the corporate form and resulting fraud or injustice. *See Escobedo*, 818 N.E.2d at 934-35; *Groves*, 371 N.W.2d at 62. In pleading these elements, Plaintiffs must do more that merely parrot the factors enumerated in the veil-piercing case law. *See, e.g.*, *G4S Servs.*, 2009 U.S. Dist. LEXIS 88689, at *3-4.

Here, Plaintiffs point to various paragraphs of the Spagnola and Bernstein Complaints that they contend satisfy the *Victoria Elevator* and *Aronson* tests and enable them to pierce Great

---

[11] As Plaintiffs rightly point out, these enumerated factors are not exclusive, and courts may of course consider additional factors, including: (1) the use of dividends and directors' meetings, (2) proper maintenance of notes of directors' meetings, (3) stated capital of the company, (4) similarity of corporate names, (5) common principal corporate officers, directors and employees, (6) similarity of business purposes and (7) whether same business locations and/or telephone numbers were used. *See, e.g.*, *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 504-05 (Ind. Ct. App. 2007) (citing *Smith v. McLeod Distrib., Inc.*, 744 N.E.2d 459, 463 (Ind. Ct. App. 2000)); *Snyder Elec. Co. v. Fleming*, 305 N.W.2d 863, 868 (Minn. 1981). However, "[w]hile the *Victoria Elevator* list of factors is not exhaustive, it does provide guidance as to the sort of considerations courts should analyze in making an alter ego determination." *Hopkins v. Trans Union, L.L.C.*, No. 03-5433 ADM/RLE, 2004 WL 1854191, at *4 (D. Minn. Aug. 19, 2004).

Northern's corporate veil. Specifically, Plaintiffs point to their allegations that (a) in a 2005 credit agreement, Chubb and its subsidiaries were "considered as a whole" for all material purposes, *see* Spagnola Compl. ¶ 27, Bernstein Compl. ¶ 26; (b) Chubb was the sole signatory of an Assurance of Discontinuance with the Attorneys General of New York, Connecticut and Illinois in 2006, in which it purported to bind all of its wholly-owned insurance subsidiaries, *see* Spagnola Compl. ¶ 28, Bernstein Compl. ¶ 27; (c) Chubb is the holding company of all shares of entities that comprise the Chubb Group, *see* Spagnola Compl. ¶ 29; (d) a March 2006 Form 10-K stated that Chubb's ability to pay dividends or otherwise satisfy its obligations was "dependent in large part on the dividend paying ability of its property and casualty insurance subsidiaries," *see* Spagnola Compl. ¶ 26, Bernstein Compl. ¶ 25; (e) there is substantial overlap of senior management, officers and directors of Chubb and the members of the Chubb Group, *see* Spagnola Compl. ¶¶ 21-25, Bernstein Compl. ¶¶ 20-23; (f) advertisements and standard form policies refer only to "Chubb" or the "Chubb Group," with no specific reference to Great Northern, *see* Spagnola Compl. ¶¶ 34-35, Bernstein Compl. ¶ 34; and (g) Chubb's standard form policies define "Chubb" as "the Chubb Group of Insurance Companies" and instructs insureds to direct questions to "Chubb," *see* Spagnola Compl. ¶¶ 36-40, Bernstein Compl. ¶¶ 36-40.

Plaintiffs contend that these allegations suffice to give Defendants "notice of their intention to pierce the corporate veil." However, this is itself insufficient, and Plaintiffs must plead sufficient allegations to make their claim of alter-ego liability plausible and more than the "mere possibility of misconduct." *Iqbal*, 129 S.Ct. at 1950. Although Plaintiffs have alleged facts to suggest some overlap between the operations of Chubb and its subsidiaries, this overlap is not unusual and Plaintiffs' allegations do not rise to the level that indicates the kind of complete domination and control that is required under the first prong of the alter-ego analysis. Indeed, courts routinely refuse to pierce the corporate veil based on allegations limited to the existence of shared office space or overlapping management, allegations that one company is the wholly-owned subsidiary of another, or that companies are to be "considered as a whole." *See Phil Crowley Steel Corp. v. Sharon Steel Corp.*, 702 F.2d 719, 722 (8th Cir. 1983) (100 percent ownership insufficient to pierce corporate veil); *SICK, Inc.*, 2003 U.S. Dist. LEXIS 10612 at *27 (allegations that companies "share employees, offices and equipment" insufficient to pierce corporate veil); *Group Health Plan*, 1999 U.S. Dist. LEXIS 9640 at *18 (parent's occasional references to "we," "our," or "the Group," to include subsidiaries insufficient to pierce corporate veil); *O'Brien v. Watco Contract Switching, Inc.*, 802 N.E.2d 999, 1007-08 (Ind. Ct. App. 2004)

(corporate ownership of subsidiary, overlapping officers and directors insufficient to impose alter-ego liability); *Extra Energy Coal*, 467 N.E.2d at 441 (nearly identical directors, officers and shareholders insufficient to find alter-ego liability).[12] Accordingly, the Court finds that Plaintiffs have failed to sustain their pleading burden on the first prong of the veil-piercing inquiry.

But, even if the Court were to find that Plaintiffs have alleged sufficient facts to support a finding that the first prong is satisfied, the Plaintiffs fail on the second. That is, with respect to the injustice element, Plaintiffs contend that "if only one Chubb insurance subsidiary is controlled by this litigation, it would leave Chubb Corp. free to operate in the same way through other of its wholly owned subsidiary group members." *See also* Spagnola Compl. ¶ 44 ("[I]f the parent were excused from these proceedings, the practices complained of would persist through other subsidiaries other than the one that nominally issued the plaintiff's policy. This would work a grave injustice and be fundamentally unfair to the thousands of other policy holders."); Bernstein Compl. ¶ 44 (same). This single allegation is "devoid of [the] further factual enhancement" required for them to be credited by this Court and is certainly insufficient, in itself, to withstand Defendants' motion to dismiss. *Iqbal*, 129 S.Ct. at 1949 (quotation omitted).

In any event, even if the Court were to credit this conclusory allegation, it is nonetheless insufficient for at least two reasons. First, it relates only to Chubb and fails to allege any facts whatsoever that would support alter-ego liability on the part of FIC. Second, such an allegation is plainly insufficient to surmount the burden to allege the kind of injustice that the alter-ego doctrine seeks to prevent, that is, injustice caused to third parties when a corporation (*i.e.*, Great Northern) is itself operated as a constructive fraud or in an unjust manner. Plaintiffs have alleged no facts to support any such conclusion, and thus the Court must find that Plaintiffs have failed to adequately meet their burden and to succeed in their effort to plead alter-ego liability on the part of either Chubb or FIC under either Minnesota or Indiana law.

   2. *Agency Theory Liability*

Plaintiff's alternative theory to bind Chubb and FIC is under agency theory. That is, Plaintiffs contend that they have alleged sufficient facts to support the conclusion that Great Northern acted as the agent of Chubb and/or FIC, and as such Chubb and/or FIC are bound by Great Northern's conduct. Yet again, Plaintiffs argue that the question of whether Chubb or FIC

---

[12] Plaintiffs fare no better in their reliance on paragraph 42 of the Spagnola and Bernstein Complaints, which essentially parrots the veil-piercing factors from *Victoria Elevator*, *Aronson*, and related case law. As noted, these "[t]hreadbare recitals . . . [and] conclusory statements" are insufficient to withstand a motion to dismiss. *See Iqbal*, 129 S.Ct. at 1949.

can be liable on an agency theory is an inherently factual one and its resolution is inappropriate on a motion to dismiss. And yet again, Plaintiffs are mistaken: courts routinely dismiss claims based on agency theory where the pleadings contain insufficient allegations in that regard. *See, e.g.*, *Adams v. Labaton, Sucharow & Rudoff LLP*, 07 Civ. 7017 (DAB), 2009 U.S. Dist. LEXIS 35085, at *11-12 (S.D.N.Y. Mar. 30, 2009); *Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452, 486-88 (S.D.N.Y. 2001); *Maung Ng We v. Merrill Lynch & Co., Inc.*, 99 Civ. 9687 (CSH), 2000 U.S. Dist. LEXIS 11660, at *26-30 (S.D.N.Y. Aug. 15, 2000); *International Customs Ass'n, Inc. v. Ford Motor Co.*, 893 F. Supp. 1251 (S.D.N.Y. 1995).

Although a parent corporation may be held accountable for the wrongs of its subsidiary under an agency theory, courts have long ago concluded that such a finding is remote. *Maung Ng We*, 2000 U.S. Dist. LEXIS 11660, at *8 (quoting *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir. 1929)) (L. Hand, J.).[13] Simply put, "the law recognizes that corporations may be organized in ways to limit liability among separate corporate entities . . . thus a parent company is not automatically liable for the acts of a wholly-owned subsidiary." *JHW Greentree Capital, L.P. v. Whittier Trust Co.*, 05 Civ. 2985 (HB), 2005 U.S. Dist. LEXIS 27156, at * (S.D.N.Y. Nov. 10, 2005) (quoting *Manchester Equip. Co., Inc. v. American Way & Moving Co., Inc.*, 60 F. Supp. 2d 3, 6 (E.D.N.Y. 1999)).

Under New York law, "an agent must have authority, whether apparent, actual or implied, to bind his principal." *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998). Plaintiffs contend that they have sufficiently alleged both actual and apparent authority. Each basis for liability will be addressed in turn.

### (a) Actual Authority

Actual authority "is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him." *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (quoting *Minskoff v. American Express Travel Related Servs. Co., Inc.*, 98 F.3d 703, 708

---

[13] To hold a corporate parent liable for the acts of its subsidiary is "materially different from recovering from a parent by disregarding the corporate form under a veil piercing analysis." *Maung Ng We*, 2000 U.S. Dist. LEXIS 11660 at *9. Thus, under an agency theory,

> the claim against the parent is premised on the view that the subsidiary had authority to act, and was in fact acting, on the parent's behalf -- that is, in the name of the parent . . . [while under alter-ego theory], the putative plaintiff does not dispute that the underlying obligation belongs to the corporate subsidiary; however, he seeks to hold the parent liable on the theory that the parent fraudulently induced the subsidiary to incur the obligation.

*Royal Indus. Ltd. v. Kraft Foods, Inc.*, 926 F. Supp. 407, 412 (S.D.N.Y. 1996), *aff'd*, 164 F.3d 619 (2d Cir. 1998).

(2d Cir. 1996)); *see also Cromer Finance*, 137 F. Supp. 2d at 486 ("Actual authority arises from a manifestation [of consent] from principal to agent.")(citations omitted). The consent necessary for actual authority may be "either express or implied from the parties' words and conduct as construed in light of the surrounding circumstances." *Cromer Finance*, 137 F. Supp. 2d at 486 (internal quotation marks and citation omitted). Thus, to establish actual agency, a plaintiff must demonstrate the following elements: (1) manifestation by the principal that the agent shall act for him; (2) the agent accepted the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking. *Maung Ng We*, 2000 U.S. Dist. LEXIS 11660 at *11-12 (quoting *Rubin Bros. Footwear, Inc. v. Chemical Bank*, 119 B.R. 416, 422 (S.D.N.Y. 1990)). Unlike apparent authority, the question of whether actual authority exists "depends upon the actual interactions of the putative agent and principal and not on the perception a third party may have of the relationship." *Manchester Equip.*, 60 F. Supp. 2d at 8.

The keystone to an agency relationship is an allegation that "the agent acts subject to the control of the principal's direction and control." *Shulman Transp. Enters., Inc. v. Pan Am. World Airways, Inc.*, 744 F.2d 293, 295 (2d Cir. 1984). Thus, "[t]here is no agency relationship where the alleged principal has no right of control over the alleged agent." *Maung Ng We*, 2000 U.S. Dist. LEXIS 11660 at *13 (quoting *Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*, 657 F. Supp. 1475, 1481 n.2 (S.D.N.Y. 1987)).

Here, in support of their position that they have adequately pled actual authority, Plaintiffs point to all the same allegations as they contended support their veil-piercing theory as evincing Chubb's complete power over its insurance subsidiaries. Plaintiffs also point to their allegations relating to Chubb's entry into an Assurance of Discontinuance with the Attorneys General of three states as support for that complete domination and control. Even if the Court were to find that these allegations were sufficient to show the type of "direction and control" necessary to show actual authority – a proposition that is itself doubtful[14] – that in itself is insufficient where, as here, Plaintiffs have pled no facts to indicate that Chubb or FIC ever manifested to Great Northern its intent that Great Northern would be authorized to bind them by its transactions with insureds. Plaintiffs have pointed out no such allegation, nor is it likely that they could, and a close parsing

---

[14] Indeed, many of the paragraphs of the Complaints to which Plaintiffs direct the Court contain nothing more than bare allegations that Great Northern and/or FIC is an agent of Chubb. *See* Spagnola Compl. ¶ 4, 13, 14, 18, 41. These allegations are merely conclusions that the Court need not credit on a motion to dismiss. *See, e.g.*, *Maung Ng We*, 2000 U.S. Dist. LEXIS 11660 at *16-17.

of the Complaints supports this proposition.  Since a manifestation of consent is an essential element of actual authority, the Court must reject this theory of liability for both Chubb and FIC.

### (b) *Apparent Authority*

To adequately plead the existence of apparent authority, a plaintiff must allege "words or conduct *of the principal*, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction on behalf of the principal."  *Cromer Finance*, 137 F. Supp. 2d at 286 (quoting *Standard Funding Corp. v. Lewitt*, 89 N.Y.2d 546, (1997)) (emphasis in *Standard Funding*).  Where a third party has reasonably relied on the principal's words of conduct to that effect, the appearance of authority binds the principal.  *Id.* at 486-87.  Thus, to recover on a theory of apparent authority, a party must sufficiently plead two elements: "(1) the principal was responsible for the appearance of authority in the agent to conduct the transaction in question, and (2) the third party reasonably relied on the representation of the agent."  *Herbert Constr. Co. v. Continental Ins. Co.*, 931 F.2d 989, 994 (2d Cir. 1991).  The core principle that underlies the theory of apparent authority is that a third party must have relied on "the misrepresentations of the agent because of *some misleading conduct on the part of the principal* – not the agent."  *Adams*, 2009 U.S. Dist. LEXIS 35085 at *10 (quoting *Herbert*, 931 F.2d at 993) (emphasis in original); *see also Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir. 1989) (rejecting notion that an agent can create apparent authority by its own actions or representations).

"Because the existence of a principal/agent relationship and the creation of apparent authority depend crucially on the words or actions of *the principal*[,] to state a claim sufficient as a matter of law . . . Plaintiff[s] . . . must allege some action on the part of [Chubb and/or FIC] from which [Great Northern's] agency may be inferred."  *Adams*, 2009 U.S. Dist. LEXIS 35085 at *11 (citing *Ferrostaal, Inc. v. M/V SEA BAISEN*, 02 Civ. 1900 (RJH) (DCF), 2004 WL 2734745, at *3 (S.D.N.Y. Nov. 30, 2004)) (emphasis in original).  That is, Plaintiffs "must show that [they] reasonably believed that [Great Northern] entered into the [Policies] on behalf of [Chubb and/or FIC] and not on its own behalf."  *Dinaco*, 346 F.3d at 69.

Here, Defendants rely in part on the Appellate Division's opinion in *Zigabarra v. Falk*, 143 A.D.2d 901 (2d Dep't 1988), in which the court found that a corporate parent could not be held on an apparent authority theory because "the contract clearly indicates that the plaintiffs were entering this transaction solely with Falk and, accordingly, any reliance upon Falk's apparent authority was unreasonable."  *Id.* at 902.  However, *Zigabarra* is distinguishable from this case

because in *Zigabarra*, there were no facts alleged, apart from the fact that contract negotiations took place at the contracting party's corporate office, that the parent had itself made any representations on which the plaintiffs could have reasonably relied. By contrast, here, Plaintiffs have made a number of factual allegations of *Chubb's* representations to the insureds, including Plaintiffs, that might have reasonably suggested that it wielded control over Great Northern and was essentially a party to the insurance contracts. *See In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp. 2d 447, 464 (E.D.N.Y. 2007) (denying summary judgment where, among other things, tickets plaintiffs purchased "themselves appear likely to have created ambiguity about whether purchasers . . . were contracting with Ritetime, World, or both"). Specifically, Plaintiffs have alleged that the cover letter enclosing the Policies bore the Chubb trademarked logo; that an integrated advertising and marketing campaign relating to the Policies referred only generally to "Chubb"; that insureds under the Policies were directed to make all inquiries to Chubb and to make payments "payable to Chubb". The Court agrees with Plaintiffs that they have thus sufficiently alleged that insureds could have reasonably believed that they had contracted with Chubb and not Great Northern, notwithstanding the express terms of the policies. Thus, while it is true that "[t]he presence of a parent's logo on documents created and distributed by a subsidiary, standing alone, does not confer authority upon the subsidiary to act as an agent," *Fletcher*, 68 F.3d at 1461-62, Plaintiffs have alleged sufficient additional facts to survive a motion to dismiss with respect to Chubb on an apparent authority theory.[15] However, Plaintiffs have failed to allege any representations at all by FIC to any third parties, to say nothing of the third parties' reliance thereon, and as such Plaintiffs have failed adequately to plead apparent authority on the part of FIC. Accordingly, Plaintiffs' breach of contract claims against FIC must be dismissed.[16]

---

[15] To the extent Plaintiffs seek to base any part of their apparent authority theory on the Assurance of Discontinuance, however, that argument must fail. The Assurance was entered into in 2006, while Spagnola purchased his Policy in 2001 and Bernstein purchased his Policies in 1988 and 1999. Having purchased their policies *before* the Assurance, Plaintiffs could not possibly have relied on the Assurance as a representation of apparent authority.

[16] Plaintiffs contend that "if repleading were required, the mentioned extrinsic evidence could be adduced to support" their claims. There are several problems with this approach, not the least of which is that it contravenes this Court's Individual Practices, which clearly state that a Plaintiff's options when faced with a motion to dismiss are to fight the motion or to amend the complaint, but not both. Moreover, as Defendants point out, Spagnola's current Complaint is his fourth version, and his counsel has had yet another bite at the apple in filing the Bernstein Complaint; not even a core is left. Thus, the dismissal of FIC from this action must be without leave to replead, as Plaintiffs have exhausted this Court's "liberal" amendment policy.

## IV.  **MOTION TO STRIKE**

As a preliminary matter to the class certification motion, the Court must address Plaintiffs' motion to strike.  By way of this motion, Plaintiffs seek to exclude the Spencer Affidavit as well as portions of Defendants' memorandum of law in support of its Motion to Deny Class Certification because (a) they relate to the merits of the case and not class certification, and (b) Defendants withheld discovery on merits discovery even where it also related to class issues, and Plaintiffs did not receive a "full and fair opportunity" to depose Spencer.  Plaintiffs' motion to strike is denied.  The record before the Court demonstrates that Defendants did not wrongfully stymie Plaintiffs' discovery efforts, and that the Spencer affidavit, along with the remainder of Defendants' arguments in support of their motion, appear to be perfectly appropriate.  To the extent any of Defendants' arguments, or any of the Spencer affidavit, encroach too far into merits-related issues rather than certification-related ones, the Court assures Plaintiffs that it is able to separate the wheat from the chaff, and will simply disregard any materials that involve solely merit issues, if there are any.

## V.  **MOTION TO DENY CLASS CERTIFICATION**

Plaintiffs filed these actions as putative class actions and seek to have the following class certified under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure:

> [A] class comprised of all persons or entities (a) who, from April 1, 2000 to the present (the "class period"), purchased replacement cost homeowners' insurance policies from Chubb, through any of its wholly-owned subsidiaries, including defendant Federal Insurance Company and its wholly-owned subsidiaries, including Great Northern Insurance Company, respecting property located in the State of New York, that state in words or substance that:
>
> > With your consent, we may change [the amount of coverage reflected in the coverage summary] when appraisals are conducted and when the policy is renewed, to reflect current costs and values.
> >
> > \*        \*        \*
> >
> > [The coverage amount] will be increased daily to reflect the current effect of inflation.  At the time of a covered loss, your amount of house coverage will include any increase in the United States Consumer Price Index from the beginning of the policy period.
>
> and (b) who either have been injured by the practices complained of or who are at risk of suffering injuries by the practices complained of.

Defendants have made a preemptive motion to deny class certification. Even though the issue of class certification thus comes before the Court on Defendants' motion, the burden remains on Plaintiffs to prove that each of the required elements for class certification under Rule 23 has been satisfied. *See Fedetov v. Peter T. Roach & Assocs., P.C.*, 354 F. Supp. 2d 471, 578 (S.D.N.Y. 2005); *see also* 5-23 MOORE'S FEDERAL PRACTICE 3d § 23.82 ("The defendant need not wait for the plaintiff to act, however. The defendant may move for an order denying class certification."). As will be described in detail below, and as one court has aptly noted, "[t]his is no *pro forma* burden." *In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69, 192 (E.D.N.Y. 2008). Indeed, under the legal standards as recently clarified by the Second Circuit, Plaintiffs now face a significant burden to show that class certification is appropriate.

## A.     Legal Standard for Class Certification

To qualify for class certification, Plaintiffs must prove that the putative class meets the four threshold requirements of Rule 23(a); if those requirements are satisfied, Plaintiffs must also establish that the class is maintainable under at least one of the subsections of Rule 23(b). As the Second Circuit recently has clarified, the requirements of Rule 23 must be proved by a "preponderance of the evidence." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). Courts must engage in a "rigorous analysis" to determine whether a plaintiff has met this burden. *In re Initial Public Offerings Sec. Litig.*, 472 F.3d 24, 33 (2d Cir. 2006) (quoting *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160-61 (1982)) ("*In re IPO*"), *reh'g denied*, 483 F.3d 70 (2d Cir. 2007). In *In re IPO*, the Second Circuit clarified what that "rigorous analysis" entails:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; [and] (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement . . . .

*In re IPO*, 471 F.3d at 41; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 34-35 (2d Cir. 2009).[17]  Thus, the Second Circuit has now expressly disavowed its previous view that class certification may be granted when plaintiffs have merely made "some showing" of the Rule 23 prerequisites.  *See In re IPO*, 471 F.3d at 32.  District courts are not required to hold a full evidentiary hearing on Rule 23 issues, so long as they "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *Bombardier*, 546 F.3d at 204 (quoting *In re IPO*, 471 F.3d at 41).  However, "[w]hile the Court of Appeals now requires district courts to dive deeper into the facts at the class certification stage, 'the holdings of *In re IPO* are both significant and narrow -- a district judge must consider all of the relevant evidence in determining whether Rule 23 has been satisfied, but a district judge may not go beyond the boundaries of Rule 23 when making such a determination.'"  *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 69 (S.D.N.Y. 2009) (quoting *Hnot v. Willis Group Holdings, Ltd.*, 241 F.R.D. 204, 209 (S.D.N.Y. 2007)).

**B.  Rule 23(a) Requirements**

To qualify for class certification, Plaintiffs must prove four elements by a preponderance of the evidence: (1) numerosity, (2) commonality, (3) typicality, and (4) adequate representation. *See* Fed. R. Civ. P. 23(a).  In addition to these elements, "Rule 23 contains an implicit requirement that the proposed class be precise, objective and presently ascertainable."  *Bakalar v. Vavra*, 237 F.R.D. 59, 64 (S.D.N.Y. 2006).  Each of the elements that are at issue in this case will be addressed in turn.[18]

*1.  Commonality and Typicality*[19]

To establish commonality, Plaintiffs must prove that common issues of fact or law exist and affect all class members.  *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 72 (E.D.N.Y.

---

[17] The resolution of any factual dispute that is material to a Rule 23 requirement is made only for the purposes of the class certification phase, "and is not binding on the trier of facts, even if that trier is the class certification judge."  *In re IPO*, 471 F.3d at 41; *see also id.* at 39 ("A trial judge's finding on a merits issue *for purposes of a Rule 23 requirement* no more binds the court to rule for the plaintiff on the ultimate merits of that issue than does a finding that the plaintiff has shown a probability of success for purposes of a preliminary injunction.") (emphasis in original).

[18] There is no dispute here that the first element required for class certification – numerosity – is satisfied, and therefore this element need not be addressed.

[19] In their memorandum of law in support of the instant motion, Defendants address commonality and typicality together, and I will do the same.  As the Supreme Court has found, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Falcon*, 457 U.S. at 158 n.13; *see also Attenborough v. Construction & Gen. Building Laborers' Local 79*, 238 F.R.D. 82, 94 (S.D.N.Y. 2006).

2004). However, class certification will not necessarily be precluded by differing individual circumstances of class members; rather, "the critical inquiry is whether the common questions are at the core of the cause of action alleged." *Vengurlekar v. Silverline Techs., Ltd.*, 220 F.R.D. 222, 227 (S.D.N.Y. 2003). Indeed, under Rule 23(a), even "a single common question may be sufficient." *Bakalar*, 237 F.R.D. at 67; *see also Marisol A. v. Giuliani*, 929 F. Supp. 662, 690 (S.D.N.Y. 1996) (citation omitted).

To establish typicality, Plaintiffs must prove that each member's claims arise from the same course of events and that each class member makes similar legal arguments to prove liability. *Steinberg*, 224 F.R.D. at 72; *see also Robidoux v. Celani*, 987 F.2d 932, 936-37 (2d Cir. 1993); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002). "The typicality requirement is meant to ensure that the class representative is not subject to a unique defense which could potentially become the focus of the litigation." *Steinberg*, 224 F.R.D. at 72. Thus, numerous cases have found that a putative class representative's claims are not typical of those of the putative class if that representative's claims are subject to unique defenses. *E.g.*, *Baffa v. Donaldson, Lufkin & Jenrette Sec. Litig. Corp.*, 222 F.3d 52, 59-60 (2d Cir. 2000); *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 63 (S.D.N.Y. 2006). The rule barring certification of plaintiffs subject to unique defenses is "not rigidly applied in this Circuit"; rather, it is generally applied "only where a full defense is available against an individual plaintiff's action." *Newman*, 238 F.R.D. at 76-77. "The test is whether the defenses will become the focus of the litigation, thus overshadowing the primary claims, and prejudicing other class members." *In re MTBE*, 209 F.R.D. at 338 n.22 (citing *Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989)). In particular as it relates to the claim here, the "unique defense" doctrine has been applied to find a plaintiff's claims atypical where his or her claim is subject to a potential defense based on the voluntary payment doctrine. *E.g.*, *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179-80 (2d Cir. 1990); *Newman*, 238 F.R.D. at 78; *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 308 (S.D.N.Y. 2004); *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 100 N.Y.2d 525, 526 (2003).

Defendants advance three different reasons why the required elements of commonality and typicality are lacking in this case; to wit, they contend that (1) Plaintiffs advance different legal interpretations of the Policy and are therefore not even typical of one another, to say nothing of the absent class members; (2) Plaintiffs' claims are subject to at least one unique dispositive defense

(*i.e.*, the voluntary payment doctrine); and (3) Plaintiffs cannot purport to represent a class of insureds who purchased an insurance policy from any entity other than Great Northern. As to this final issue, this Court's lengthy discussion on Defendants' Motion to Dismiss should quell Defendants' concern, as it has now been held that no claims may be advanced based on any policy issued by any insurance subsidiary other than Great Northern. While the other two concerns do give me some pause, ultimately the Court finds that Plaintiffs have satisfied their burden to prove typicality and commonality – if only barely.[20]

First, Defendants' argument that the Plaintiffs advance differing interpretations of the contracts at issue need not derail the Court for long. Here, Plaintiffs contend that the "practices complained of" are Chubb's increase of coverage in some as-yet unknown way that did not, as the policies provided, reflect either "current costs and values" or CPI. In other words, Plaintiffs' claims are apparently based on the contention that a reasonable policyholder could have interpreted the Policy to provide that one of the ways in which coverage could be increased was according to CPI. However, Spagnola testified at his deposition that he never understood that annual increases would be tied to CPI, and indeed, that it would be unreasonable to so interpret the Policy. *See* Spagnola Dep. at 152:2-153:2. Bernstein, on the other hand, testified that he understood that the annual increases had to "be based entirely on the CPI." Bernstein Dep. at 82:13-20.

While this testimony illustrates that the Plaintiff's views of the meaning of the contract are antithetical to one another, nonetheless the contract can only have had one actual meaning. It is not the Court's task, at this stage of the proceedings, to determine what that meaning was. But whatever the contract meant, it had the same meaning with respect to all policyholders, and the final determination of that meaning does not depend on Plaintiffs' own subjective understanding. Thus, as Plaintiffs contend, the claims at issue in this case bear at least two common questions: (a)

---

[20] As an initial matter, the Court must reject Plaintiffs' attempt to bootstrap the Second Circuit's decision on an appeal of the dismissal of Spagnola's Complaint into a finding of typicality. Here, Plaintiffs inexplicably argue that "[t]he Second Circuit's reinstatement of the contract claims carries implicit recognition of the typicality of the class and the appropriateness of class certification." The reasoning behind this contention is that in reversing this Court's dismissal of Spagnola's breach of contract claim, the Second Circuit relied on a New York state court case, which in its subsequent history also was certified as a class action under New York law. Plainly, the subsequent history of a different case, with different facts and different putative class representative, cannot be the basis for such a far-fetched conclusion. Put another way, the Second Circuit gave no indication in its opinion that it contemplated any future class treatment in this case.

the meaning of the term "current costs and values" and its relationship to CPI, and (b) whether the methodology that was actually used to raise coverage was permitted under the contract.[21]

Defendants' second argument – that a finding of typicality is precluded by the availability of a unique defense – gives the Court a bit more pause. The Second Circuit expressly acknowledged that Spagnola's claim (and by extension, Bernstein's claim) ultimately may be determined to be barred by the voluntary payment doctrine, but found that it was too early to arrive at that conclusion. *See Spagnola*, 574 F.3d at 73. Defendants now argue that it is no longer "too early . . . to conclusively answer [the] question" of whether the voluntary payment doctrine applies to bar Plaintiffs' claims, *see id.* at 73, because subsequent discovery makes it "clear beyond peradventure that their claims should be dismissed" based on the doctrine. The Circuit, however, comes out differently, and instructs us that "in making [Rule 23] determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re IPO*, 471 F.3d at 41. The Court does acknowledge that commonality and typicality under Rule 23(a)(2) and (3) are not terribly exacting hurdles to overcome – indeed, as numerous courts have found, even "a single common question may be sufficient" to satisfy the Plaintiffs' burden, and the existence of some individualized questions need not destroy commonality or typicality. *See, e.g.*, *Bakalar*, 237 F.R.D. at 67; *Vengurlekar*, 220 F.R.D. at 227. Here, Plaintiffs' claims, and the claims of the putative class, arise out of the same course of conduct or practice and are based on essentially the same legal theories; thus, the potential for a unique defense does not preclude a finding of commonality and typicality.[22]

   2. *Adequate Representation*

To show that absent class members are adequately represented, Plaintiffs must prove that (1) class counsel is qualified, experienced, and generally able to conduct the litigation, *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992);[23] and (2) proposed class representatives have no interests that are antagonistic to the proposed class members, *In re Joint E.*

---

[21] However, as will be discussed in further detail, Plaintiffs utter inability to arrive at a single theory of their cases reflects upon their inability to serve as adequate representatives for the absent class.

[22] The availability of the voluntary payment defense does, however, preclude a finding of predominance, as will be discussed in detail below.

[23] Defendants raise no argument to challenge the expertise or competence of Kirby McInerney LLP, proposed class counsel, or of Roger Kirby or Peter Linden, lead plaintiffs' attorneys, to litigate this case. However, it is worth noting that, as this Court has held in the past, because "[t]he proposed class includes thousands of [policyholders], both male and female, arguably from diverse racial and ethnic backgrounds . . . it is important to all concerned that there is evidence of diversity, in terms of race and gender, of any class counsel." *In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 277 (S.D.N.Y. 2007). Here, Kirby McInerney has provided no information – firm resumé, attorney biographies, or otherwise – on this score.

& *S. Dist. Asbestos Litig.*, 78 F.3d 764, 778 (2d Cir. 1996). The purpose of Rule 23(a)(4)'s adequacy requirement is "to ferret out potential conflicts between representatives and other class members." *Freeland v. AT&T Corp.*, 238 F.R.D. 130, (S.D.N.Y. 2006) (emphasis and citation omitted). Courts are to "carefully scrutinize the adequacy of representation in all class actions." *Attenborough*, 238 F.R.D. at 100 (quoting *Eisen v. Carlisle & Jacqueline*, 391 F.2d 555, 562 (2d Cir. 1968)). "Courts do not require the representative plaintiff to be the best of all possible plaintiffs." *Bano v. Union Carbide Corp.*, 99 Civ. 11329 (JFK) (HBP), 2005 U.S. Dist. LEXIS 32595, at *29 (S.D.N.Y. Aug. 12, 2005). Rather, factors that the Court should consider to determine whether the absent class is adequately represented include: (1) whether the proposed plaintiffs are credible, *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998); (2) whether the proposed plaintiffs have adequate knowledge of the case and are actively involved, *Baffa*, 222 F.3d at 61; and (2) whether the interest of the proposed plaintiffs are in conflict with those of the remainder of the class, *Attenborough*, 238 F.R.D. at 101 (citing *Epifano v. Boardroom Bus. Prods., Inc.*, 130 F.R.D. 295, 300 (S.D.N.Y. 1990)).

Numerous courts also have found that a named plaintiff is an inadequate representative where there is a close personal relationship between a plaintiff and class counsel. *E.g.*, *Drimmer v. WD-40 Co.*, No. 07-56841, 2009 WL 2519188, at *1 (9th Cir. Aug. 19, 2009); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1254-55 (11th Cir. 2003); *Martz v. PNC Bank, N.A.*, No. 06-1075, 2007 WL 2343800, at *5 (W.D. Pa. Aug. 15, 2007) ("When a close personal relationship exists between the named representative and class counsel, courts fear the danger of champerty."). "This is especially true in cases . . . where attorneys' fees will greatly exceed the class representative's recovery." *Martz*, 2007 WL 2343800 at *5.

In this case, there are numerous elements that lead the Court to conclude that Plaintiffs have not shouldered their burden to prove that they are adequate class representatives. First, as eluded to earlier, Plaintiffs' plainly divergent views of the meaning of the contract indicate that there may even be a conflict as between the putative class representatives with respect to their respective theories of the case, to say nothing of the absent class. Moreover, there is an apparent conflict between Spagnola and Bernstein, as holders of an extended replacement cost homeowners' policy, and members of the class who may have purchased conditional or verified replacement cost policies. That is, in an extended replacement cost policy – such as those purchased by Spagnola and Bernstein – the insurer is obligated to pay the full replacement cost, even if that cost exceeds the coverage amount under the Policy. Put another way, under the

extended replacement cost policy, the insurer bears the risk of underinsurance.  Under the verified or conditional replacement cost types of policies, on the other hand, the insurer is obligated to pay only up to a specified amount, and the policyholder bears the risk of underinsurance.  Thus, some members of the class (extended replacement cost policyholders) may wish for the term "current costs and values" to be interpreted in a particular way, while other class members (verified or conditional replacement cost policyholders) may wish for that same term to be interpreted in a completely different way, depending on what best served their interests.  Plaintiffs have produced no evidence to allay the concerns of the Defendants or this Court that these diverging interests cause an inimitable conflict with respect to the class representatives, and thus, it being Plaintiffs' burden of proof, that precludes class certification.

Moreover, the Court has serious concerns relating to Spagnola's adequacy as a class representative due to his constantly changing interpretation of the contract and his abjuration of the very allegations of his Complaint.  As but one example, Spagnola's Complaint alleges that the Policy "leads the insured reasonably to believe that changes in amounts at point of renewal will . . . [be] governed by [CPI]," while he testified at his deposition that he never believed that to be true, and did not think that it would be reasonable for a policyholder to believe that the coverage amount varied with CPI, as they are two "different concepts."  Spagnola Dep. at 152:8-22.  Additionally, while the Complaint alleges that changes in coverage were presented to policyholders on a "take it or leave it" basis, *see* Spagnola Compl. ¶¶ 84, 85(o), Spagnola testified that he was told that if he thought his estimated construction cost was too high, could request a reassessment from the insurance company, *see* Spagnola Dep. at 104:18-21.  These instances, among others, illustrate that Spagnola may be prone to give inconsistent or incredible testimony in future proceedings in this case, and this in itself casts serious doubt on his adequacy as class representative.

As to Bernstein, there are likewise numerous problems with his representation of the class.  First, Plaintiffs seek to certify a class of individuals or entities who purchased their policies from 2000 to the present, but Bernstein purchased his policies in 1988 and 1999, and thus appears to fall outside of the very class definition he seeks to certify.  Moreover, another nail in Bernstein's coffin is his longstanding "close friendship" with his attorney, Roger Kirby.  The two have known each other for almost 40 years, having first met as officemates at a law firm their first year after law school; they socialize often; they "talk all the time" and visit each other's vacation homes.  *See* Bernstein Dep. at 49:22-51:14.  Moreover, while Bernstein is not even aware of the amount of

damages that he seeks in his case, *see id.* at 65:2-13, it is likely to fall far short of any potential attorneys' fees if his claims prove successful. *See also* Bernstein Compl. ¶ 107 (alleging likely pro rata damages award to be less than $5,000).[24]

For these reasons, the Court finds that neither Spagnola nor Bernstein has proved their adequacy to serve as class counsel by a preponderance of the evidence. Class certification could be denied, and Defendants' motion granted, on that basis alone; however, for the sake of completeness, the Court will proceed to address the remaining Rule 23 requirements.

### 3. *Ascertainability*

"Whether a proposed class is ascertainable is fundamental to certification." *Bakalar*, 237 F.R.D. at 64 (citation omitted); *see also In re MTBE*, 209 F.R.D. at 337. Class membership must be readily identifiable such that a court can determine who is in the class and bound by its ruling without having to engage in numerous fact-intensive inquiries. *Bakalar*, 237 F.R.D. at 64. While class members need not actually be ascertained prior to certification, they must be ascertainable at some stage of the proceeding. *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 338 (S.D.N.Y. 2004). "An identifiable class exists if its members can be ascertained by reference to objective criteria. Where any criterion is subjective, *e.g.*, state of mind, the class is not ascertainable." *In re MTBE*, 209 F.R.D. at 337 (citations omitted).

Defendants contend that the class definition as proffered by Plaintiffs (*i.e.*, all persons "who either have been injured by the practices complained of or who are at risk of suffering injuries by the practices complained of") would require the Court to engage in a fact-specific inquiry for each class member to determine whether each suffered an injury, and whether such injury was caused by the alleged practices. Defendants slice the issue too thin. Here, it seems clear that the purchasers of the challenged Policies during the class period could be identified by reference to objective criteria that is, in all likelihood, contained within Defendants' own records and computer systems. Accordingly, the implied requirement of ascertainability has been satisfied.

## C. Rule 23(b)(2) Requirements

Rule 23(b)(2) provides that an action may be maintained as a class action if, in addition to the threshold requirements of Rule 23(a), "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or

---

[24] Indeed, at oral argument on the class certification motion, Plaintiffs all but conceded that the Court need not – and perhaps should not – certify the Bernstein case as a class action for just these reasons. *See* Transcript of Oral Argument, dated December 3, 2009, at 20:22-21:5.

corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Generally, in a case such as this where monetary relief is requested in tandem with injunctive relief, "the court must determine whether the requested monetary relief predominates over the claims for equitable relief." *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 18 (2d Cir. 2003). To determine whether to certify such a class under Rule 23(b)(2), "a district court must consider the evidence presented at a class certification hearing and the arguments of counsel, and then assess whether (b)(2) certification is appropriate in light of the relative importance of the remedies sought, given all of the facts and circumstances of the case." *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 167 (2d Cir. 2001). To make this determination, a court "should, at a minimum, satisfy itself of the following: (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Id.* Rule 23(b)(2) applies only when class treatment is "clearly called for." *In re MTBE*, 209 F.R.D. at 341 (citing Fed. R. Civ. 23(b)(3) Advisory Committee's Note).

Here, Plaintiffs have abandoned their quest for (b)(2) certification. Their opposition to Defendants' motion contained virtually no argument whatsoever on this score, and at oral argument Plaintiffs' counsel did "not contest[] the Court" in its estimation that Plaintiffs had failed to bear their burden of proof to justify certification under Rule 23(b)(2). *See* Transcript of Oral Argument at 18:20-19:17. In any event, it does not appear that this case is one where "even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain [the] injunctive . . . relief sought." The only injunctive relief Plaintiffs sought here was to prevent the continued use of the offending terms "current costs and values" in the Policy language; however, it appears that such language has already been eliminated from the Policy. Accordingly, as the crux of this case appears to be the recovery of monetary damages, certification under Rule 23(b)(2) is inappropriate.

## D.     Rule 23(b)(3) Requirements

A class action is maintainable under Rule 23(b)(3) when "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Thus, to be certified as a Rule 23(b)(3) class, Plaintiffs bear the burden to prove two elements: predominance and superiority.

*1. Predominance*

The predominance requirement is much more stringent than the commonality requirement under Rule 23(a) and requires that common questions be the focus of the litigation. *E.g.*, *Steinberg*, 224 F.R.D. at 73. That is, the predominance inquiry is used to test whether a class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). Common questions of law and fact predominate when issues subject to generalized proof and applicable to the class as a whole predominate over, and are more substantial than, issues that are subject to individualized proof. *See in re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001), *abrogated on other grounds by*, *In re IPO*, 471 F.3d 24 (2d Cir. 2006). "This requirement is more demanding than the commonality requirement under Rule 23(a); thus a court must deny certification where individual issues of fact abound." *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. at 309; *see also In re MTBE*, 209 F.R.D. at 349).

As Plaintiffs contend, breach of contract claims certainly can be appropriate for class treatment, but only where they are subject to generalized proof. *See McCracken v. Best Buy Stores, L.P.*, 248 F.R.D. 162, 168 (S.D.N.Y. 2008). In particular, actions that involve form or uniform contracts have been recognized as being well-suited for treatment as a class action. *See Steinberg*, 224 F.R.D. at 74 ("[C]laims arising from interpretations of a form contract appear to present the classic case for treatment as a class action . . . ."). However, courts have denied certification even in cases that involved form contracts where numerous individual inquiries were required to determine whether a breach of the contract could be found. *E.g.*, *Pastor v. State Farm Mut. Auto. Ins. Co.*, No. 05 C 1459, 2005 U.S. Dist. LEXIS 22338 (N.D. Ill. Sept. 30, 2005); *Adams v. Kansas City Life Ins. Co.*, 192 F.R.D. 274 (W.D. Mo. 2000); *Sparano v. Southland Corp.*, No. 94 C 2098, 1996 U.S. Dist. LEXIS 17485 (N.D. Ill. Nov. 21, 1996). Moreover, similarly to the commonality/typicality inquiry, numerous courts have found that the predominance requirement is not satisfied where class claims are subject to a unique defense under the voluntary payment doctrine. *E.g.*, *Gawry v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 942, 957 (N.D. Ohio 2009); *Camafel Building Inspections, Inc. v. Bellsouth Advertising & Publ'g Corp.*, 06-CV-4501-JEC, 2008 WL 649778, at *11 (N.D. Ga. Mar. 7, 2008); *Endres v. Wells Fargo Bank*, No. C 06-7019 PJH, 2008 WL 344204, *11-12 (N.D. Cal. Feb. 6, 2008); *Morrissey v. Nextel Partners, Inc.*, 880 N.Y.S.2d 874 (N.Y. Sup. Ct. Albany Co. 2009).

Here, I agree with Defendants' position that Plaintiffs' ultimate burdens of proof in these actions are not subject to class-wide proof. Rather, proof of class members' claims would require, *inter alia*, analysis of the unique characteristics of each class member's home, whether each policyholder's coverage was actually increased using CPI or some other guideline, the amount of the increase, whether the policy requested that the increase be waived or revalued, and actual replacement cost of each policyholder's home. Compounded with these individual questions is the lingering concern relating to the potential unique defense of voluntary payment, among others. Ultimately, the Court or the jury will be tasked with the determination, for each individual class member, whether they knew or should have known of the circumstances surrounding the increases in their respective coverages but continued to pay, or whether such payment was the result of a mistake of fact or law relating to their obligation to pay.[25] *See Spagnola*, 574 F.3d at 72. Thus, while Plaintiffs were successful in overcoming the comparatively lower hurdle of commonality and typicality under Rule 23(a), they have failed to prove the "more demanding" requirement of predominance of common issues under Rule 23(b)(3), and class certification must be denied on that ground as well.

    2. *Superiority*

To determine whether a class action is superior to other methods of adjudication, a court may look to the following factors: (1) the interest of the class members in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation already commenced by or against class members; (3) the desirability of concentrating the litigation of the claims in a particular forum; and (4) difficulties likely to be encountered in the management of a class action. *See* Fed. R. Civ. P. 23(b)(3). In particular, courts have found that class treatment is appropriate in "negative value cases," where the individual interest of each class member's interest in the litigation is less than the cost to maintain an individual action. *See, e.g.*, *Noble*, 224 F.R.D. at 346; *In re MTBE*, 209 F.R.D. at 350 (citation omitted). However, "[t]he greater the number of individual issues, the less likely that superiority can be established." *Cohn v. Massachusetts Mut.*

---

[25] In opposition to Defendants' motion, Plaintiffs rely in large measure on *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29 (E.D.N.Y. 2008), in which the district court certified a class action notwithstanding the availability of an individual defense against the class representative under the voluntary payment doctrine. *See id.* at 38-39. However, *Dupler* is easily distinguishable and is limited to its own unique facts. There, the plaintiff denied the defendant's contention that she knew at the time she renewed her membership that defendant would apply its backdating policy to her membership, and thus the applicability of the voluntary payment defense was in dispute. Here, by contrast, Plaintiffs have not denied that the voluntary payment doctrine will become an issue, but rather argue that it will be an issue that is common to the class as a whole. This justification is simply too weak to overcome the clearly numerous individual issues that are likely to become the focus of this litigation, and the weight of the authority counsels that the Court find a lack of predominance based, in part, on the availability of the voluntary payment defense.

*Life Co.*, 189 F.R.D. 209, 219 (D. Conn. 1999). Here, as noted, the need for mini-trials on the resolution of each class member's claims and the applicability of affirmative defenses detracts from the superiority of the class action device, to say the least. Plaintiffs offer no real response to Defendants' contentions in this regard, and thus have failed to shoulder their burden of proof on this element of class certification, too.

\*       \*       \*

Accordingly, while certain of the Rule 23 elements have been satisfied, the Court finds that Plaintiffs have failed to prove, by a preponderance of the evidence, that class certification is proper in this case. For that reason, Defendants' Motion to Deny Class Certification must be granted.

## VI. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part and denied in part, Plaintiffs' Motion to Strike is denied and Defendants' Motion to Deny Class Certification is granted. The parties shall proceed with discovery on the merits of Plaintiffs' individual claims for breach of contract against Great Northern and the Chubb Corporation forthwith in accordance with the Pretrial Scheduling Order entered in this matter on November 4, 2009. As discussed herein, Chubb's potential liability in this case is limited to allegations of Great Northern's apparent authority to act on its behalf, and any discovery as to Chubb's conduct going forward should be limited accordingly. Thus, there shall be no discovery relating to the issuance of Masterpiece homeowners' policies by any other insurance subsidiary, or relating to Plaintiffs now-rejected theory of alter-ego liability. The Clerk of this Court is instructed to remove the Individual Defendants and FIC from the caption of these actions, and to close these motions on my docket (Spagnola Docket Nos. 77, 83 and 88; Bernstein Docket Nos. 13 and 22).

IT IS SO ORDERED.
New York, New York
January ⎯⎯, 2010

U.S.D.J.

28