UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRED SPAGNOLA, individually and on behalf of all those similarly situated,<br><br>                   Plaintiff,<br><br><br>      -against-<br><br>THE CHUBB CORPORATION, FEDERAL INSURANCE COMPANY, GREAT NORTHERN INSURANCE COMPANY, JOHN D. FINNEGAN, and THOMAS F. MOTAMED,<br>                Defendants. | 06 Civ. 9960 (HB)<br><br><br>**ECF CASE**<br><br>**REDACTED PURSUANT TO PROTECTIVE ORDER** |
| JONATHAN A. BERNSTEIN, individually and on behalf of all those similarly situated,<br>                   Plaintiff,<br><br><br>      -against-<br><br>THE CHUBB CORPORATION, FEDERAL INSURANCE COMPANY, GREAT NORTHERN INSURANCE COMPANY,  JOHN D. FINNEGAN, and THOMAS F. MOTAMED,<br>                Defendants. | 08 Civ. 193 (HB) |

**PLAINTIFFS' MEMORANDUM OF LAW RESPECTING
SECOND CIRCUIT'S VACATUR AND THIS COURT'S
ORDERS OF SEPTEMBER 22, 2011**

**TABLE OF CONTENTS**

Page No.

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      WAL-MART. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     THE LEGAL FRAMEWORK HERE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    COMMON ISSUES, DRIVEN BY COMMON PROOF.. . . . . . . . . . . . . . . . . 10

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page No.**

*General Telephone Co. of Southwest v. Falcon,*
    457 U.S. 147 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Gray v. Hearst Communications, Inc.,*
    No. 10-1302, 2011 WL 3734413 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Initial Pub. Offerings Securities Litigation,*
    471 F.3d 24 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Jermyn v. Best Buy Stores,*
    No. 08 Civ. 214, 2011 WL 4336664 (S.D.N.Y. Sept. 15, 2011). . . . . . . . . . . . 3, 4

*Public Employees' Retirement System of Mississippi v. Merrill Lynch,*
    No. 08 Civ. 10841, 2011 WL 3652477 (S.D.N.Y. Aug. 22, 2011). . . . . . . . . . . . 3

*Safeco Ins. Co. of America v. Burr,*
    551 U.S. 47 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Spagnola v. Chubb Corp.,*
    264 F.R.D. 76 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Spagnola v. Chubb Corp.,*
    574 F.3d 64 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 17

*Trombley v. Bank of America,*
    No. 08 Civ. 456, 2011 WL 3273930 (D.R.I. July 29, 2011). . . . . . . . . . . . . . . . . 4

*Wal-Mart Stores v. Dukes,*
    131 S.Ct. 2541 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-5, 10


**OTHER AUTHORITIES**

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,*
    84 N.Y.U. L. Rev. 97 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## INTRODUCTION

At the status conference on September 22, 2011, this Court ordered that the parties brief the pertinence of *Wal-Mart Stores v. Dukes*, 131 S.Ct. 2541 (2011) to that part of this Court's class decision that decided commonality. *Wal-Mart* makes clear that Your Honor's determination that this proposed class satisfies Federal Rules of Civil Procedure 23(a)'s commonality requirement was correct.

## ARGUMENT

### I. WAL-MART

Justice Scalia starts by noting that "the crux of this case is commonality." *Id.* at 2550. He reaffirms the Court's prior definition of commonality, and does not propose a new one: "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury'[.]" *Id.* at 2551 (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). *Falcon* is venerable law, and the source of the rule that class certification requires "rigorous analysis." It informed the Second Circuit's decision *In re Initial Pub. Offerings Securities Litigation*,[1] which articulates what a "rigorous analysis" entails, and clarifies that a district court may inquire into the merits to the extent necessary to decide Rule 23 issues. *Wal-Mart* affirms that approach. *Ibid.*

*Wal-Mart* describes the required demonstration of "same injury" this way: plaintiffs' "claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover,

---

[1] 471 F.3d 24 (2006).

must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Ibid*.

We apply that test. The *Spagnola* case is a standard form contract case. This Court earlier agreed that a standard form contract is to be construed, consistent with the Restatement of Contracts rule, the same way for everyone.[2] The *Spagnola* class "depends upon a common contention" within the meaning of *Wal-Mart* because these insurance policies have identical language, and, if breached, a common injury is done to all plaintiffs. Indeed, a class claim where defendant says it appropriately performed a standard form contract satisfies the *Wal-Mart* standard of "commonality" almost by definition. Here, plaintiff claims breach of contract; Chubb denies it has breached any contract, *i.e.*, it says its contract performance is fully consistent with the contractual obligation the standard form contract imposes. At center stage in any trial is "common proof" about what Chubb does. If Chubb's processes are deemed contract compliant, "the validity of each one of the claims [is resolved] in one stroke," just as *Wal-Mart* requires. Finding commonality is consistent with Justice Scalia's observation that, "[w]hat matters to class certification is not the raising of common 'questions,' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common

---

[2]     *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 94 (S.D.N.Y. 2010).

answers."[3] As Judge Rakoff held in *Public Employees' Retirement System of Mississippi v. Merrill Lynch*,[4] this part of *Wal-Mart* means that merely raising common questions would not do. Rather, it is allegations that lend themselves to one stroke *answers* that do the required work, even if, after the answers to common issues are given, multiple other individual issues remain. After all, Justice Scalia pronounced the Court unanimous that Rule 23(a)(2) is satisfied if there is only *one* common issue.

This is surely the correct way to read *Wal-Mart* because the decision also makes clear that the fact that the class may include many members with no ability to prove damages does not defeat commonality or certifiability. *Wal-Mart* describes securities fraud class actions as complying with Rule 23 although some or all of the class members may fail at trial to establish their entitlement to relief, even if a common liability issue is decided in their favor. In particular, some such plaintiffs may lose because of their inability to show reliance. *Wal-Mart*, 131 S.Ct. at 2552 n.6.

Recent decisions uphold commonality in cases somewhat similar to this one. On September 15, 2011, Judge Colleen McMahon issued her opinion in *Jermyn v. Best Buy Stores*.[5] It contains a detailed analysis of *Wal-Mart* that we cannot improve upon, so we attach it here. She concludes that *Wal-Mart* is basically a case about the requirements for

---

[3]     *Wal-Mart*, 131 S.Ct. at 2551 (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

[4]     No. 08 Civ. 10841, 2011 WL 3652477, at *6 (S.D.N.Y. Aug. 22, 2011).

[5]     No. 08 Civ. 214, 2011 WL 4336664, at *5 (S.D.N.Y. Sept. 15, 2011).

establishing a Title VII case, where proof of motivation is involved, and has no bearing upon the propriety of maintaining a class action that complains, just as here, of a policy of refusing to honor a promise. In *Best Buy*, the promise was made by advertising; here by an insurance company's uniform contract. Although that case is a deceptive practice cause of action, the "common" issue is whether the defendant had a practice of making a promise it did not honor.

In *Gray v. Hearst Communications, Inc.*,[6] a putative class alleged defendants' breaches of uniform contract language. Affirming certification, the Circuit Court explained that, "because [as here] the putative class members all assert injury from the same action (i.e. failure by [defendant] to follow its [contracted] standard distribution practice), and determination of whether [defendant] breached its standard distribution obligation will resolve in one stroke an issue that is central to the validity of the class members' breach of contract claims." Similarly, in *Trombley v. Bank of America*,[7] the court approved a settlement class where the claim was breach of contract, the particular promise being the implied covenant of good faith and fair dealing. In doing so, the court had to determine that the class had "commonality," and, because the case was based on breach of contract, it obviously did.[8]

---

[6]     No. 10-1302, 2011 WL 3734413, at *3 (4th Cir. 2011).

[7]     No. 08 Civ. 456, 2011 WL 3273930, at *3 (D.R.I. July 29, 2011).

[8]     We might add that *Wal-Mart* involves employment discrimination claims, a setting where individual claims are viable and often litigated individually. Hence part of the Supreme

## II.    THE LEGAL FRAMEWORK HERE

This case started its complicated path so long ago that a review of where we have been, and where we are now, may be useful.

1.    These personal lines insurance contracts are governed by N.Y. Insurance Law §3425. That law, and the insurance contract itself, which imports the statutory language into the contract, give the insured who signs a one year contract a legal right to purchase two additional years of coverage on the same terms and conditions, by paying the insurer's then current filed rates.  Thus, an insurer is not "the master of its offer," and cannot simply add or subtract terms as it pleases.

2.    Where a house is insured, Chubb's Masterpiece contract contains two essentially identical provisions, one applicable to the house's reconstruction costs and the other applicable to the insured's personal property in the home, so-called "contents" coverage.  Each provision tells the insured that with the insured's consent, Chubb may at the policy's renewal change the valuation of the insured property to reflect "current costs and values." Each provision – reconstruction and contents – also tells the insured that, during the one year period between renewals, property values will be increased each day to reflect the increase in the consumer price index.

---

Court's concern is encouraging efficient management of claims that will predictably require judicial attention. The present case, however, is the kind of relatively low value case that must be maintained as a class action or cannot be brought at all.  Rule 23's principal purpose was to facilitate such claims; and defense arguments that stress efficient resolution, etc., obviously mask their true ambition, which is to achieve "efficiency" by assuring no one shows up to litigate.

3. Where a condominium or cooperative apartment is insured (Bernstein owned a Chubb policy on his apartment, in addition to one on his house), the policy does not cover costs of reconstruction. The apartment building carries insurance for that kind of loss. The policy does, however, authorize Chubb to adjust coverage of the apartment's "contents" to reflect changes in costs and values.

4. The contract language relating to costs and values imposes *no duty* on the insurer, express or implied, to adjust coverages for costs and values. The insurer may adjust, but it need not do so.[9] Other than its reference to the consumer price index, the contract says nothing whatever about inflation, and to reiterate, Chubb makes no other promise that it will make adjustments to keep coverages up-to-date.

5. At renewal, Chubb sends a multi-page and dense information package in the midst of which are property valuations. Chubb does not disclose that it has changed the valuation from the year before, or the amount of the prior year's coverage. If the customer does not retrieve the prior year's announcement and study the full document, s/he will not know from the information provided that a change was made. Chubb does, however, say that the customer has obtained "annual premium savings" even as premiums rise. The Second Circuit thought to make mention of this little deception twice.[10]

---

[9] As plaintiff reads the contract, however, it does adjust property valuations – both for house reconstruction costs and for contents – in accordance with the consumer price index. The contract clearly does this throughout the first year.

[10] *Spagnola v. Chubb Corp.*, 574 F.3d 64, 73 (2d Cir. 2009).

6

6.     Chubb does not rely upon any independent index of inflation when it sets its costs and values adjustments.   For house construction costs, at policy renewal it computes its own number in a manner described *infra*.   Those numbers have consistently been vastly higher than the consumer price index, and higher than inflation construction costs recorded by government indices.  *See* Appendix to Complaint; Bureau of Economic Analysis' National Price Index for Private Fixed Investment for Single-Family Structures, http://www.bea.gov/national/nipaweb/SelectTable.asp (last visited Oct. 4, 2011).

7.     When Chubb sets "contents" coverage, where the insured has also purchased a policy that covers house reconstruction costs, as Spagnola and Bernstein did, Chubb pays no attention to the current costs and values of replacing contents.   It sets "contents" at 50% of house reconstruction costs.[11]  Because Chubb's estimates of house reconstruction costs vastly exceed inflation measured by the CPI, contents coverages increases have no relation to the changes in the property value of contents.

8.     Bernstein's Cooperative Apartment insurance has a "costs and values" clause, and the record shows that Chubb put annual increases in effect that consistently exceeded those suggested by the consumer price index.   The record does not show anything about how Chubb computes those increases.   In this case, Chubb refused to tell Spagnola,

---

[11]     Chubb tried to defend this as industry practice. The Second Circuit would have none of it. *Id.* at 71-72.

because it claimed a house owner could not represent an apartment dweller.[12]    When Bernstein filed his own case, he was not permitted to take depositions, among other limitations.

9.    Plaintiff Spagnola initially brought suit on a number of theories. The most straightforward was that the New York Insurance Law forbids imposing changes to property coverages by threatening to cancel the policy if they are not accepted, unless the amounts of the coverages are determined by an independent index, such as the consumer price index.

Your Honor rejected the claim, and the Court of Appeals affirmed, but it did so on the grounds that an adjustment for "costs and values" was sufficiently like "appraised value" to pass muster under the New York statute.[13]

10.    Plaintiff Spagnola claimed that Chubb's practices were deceptive business practices. This Court disagreed; and the Court of Appeals affirmed on the different ground that the statute requires a deception that is independent of a breach of contract.

11.    Spagnola also claimed straight breach of contract. In particular,

---

[12]    Great Northern's Objections and Responses to Plaintiff's Interrogatories Pursuant to Rules 26, 33 at 5 n.1 (Mar. 14, 2007) ("With respect to condo and coop policies for which there is no dwelling coverage, contents coverage is assessed differently. As the third amended complaint purports to state claims relating only to policies that offer both dwelling and contents coverage, *information concerning such condo or coop policies is not relevant to the claims or defenses of any party*, not reasonably calculated to lead to the discovery of admissible evidence or otherwise not subject to discovery under the Federal Rules of Civil Procedure.") (emphasis added).

[13]    *Spagnola*, 574 F.3d at 69-70.

8

a.  Properly construed, the contract term "costs and values" *means* adjustment by reference to some consumer price index.

b.  If it does not mean this, it nonetheless, does not authorize Chubb to pick numbers by an undisclosed process that does not in fact focus on the costs of reconstructing Spagnola's home, and is a subterfuge by which Chubb generates additional revenue.

c.  Chubb's practice of inflating house "contents" coverage at a rate that has nothing to do with changes in the price of contents is a breach of promise.

The Court of Appeals accepted that these were plausible contract claims.[14]

12.  When Bernstein commenced his action, his presence made clear that any objection to Spagnola's representation of a class that included cooperative apartment owners was effectively mooted. Chubb imposed on Bernstein "costs and values" increases amounting to a 57.7% increase from 2000 to 2005 of his initial contents valuation, during a time period when the relevant CPI increased from 184.2 in December 2000 to 214.2 in December 2005,[15] an increase of 16.28%. It strongly suggests that the "cost and value" process applicable to cooperatives and condominiums is not part of a *bona fide* process to measure inflation.

---

[14]  *Id.* at 71-72.

[15]  Bureau of Labor Statistics, 2005 Consumer Price Index Detailed Report Tables, (December 2005), http://www.bls.gov/cpi/cpid0512.pdf, Table 10.

## III.    COMMON ISSUES, DRIVEN BY COMMON PROOF

Each of the contract claims described in paragraphs *supra* meets *Wal-Mart*'s commonality test.  Common issues of law can hardly be subject to a "significant proof" standard.  "What matters" though, to quote Justice Scalia, is that the case will generate "common answers apt to drive the resolution of the litigation."[16]  Because facts and law are often intertwined, and the litigation will be driven by common proof, we set out some of what the records show.

1.    Chubb's process for setting "costs and values" for homes does not comply with *any* plausible construction of the contract.  The Court of Appeals, it will be recalled, said that Chubb did not violate §3425 because "costs and values" is akin to "appraised value."

What does Chubb do?  The present and highly constrained record shows that Chubb does an appraisal when Spagnola or another *first purchases* a Masterpiece policy on his house.[17]  That appraisal generates detailed information about the house's age, size and use

---

[16]    *Wal-Mart*, *supra* n.3.

[17]    Spencer's affidavit may create the impression that regular appraisals are done. ("When the policy is first issued, the amount of coverage reflects information received from the policyholder and/or insurance agent concerning the value of the house... *Subsequently*, a replacement cost appraisal is conducted of the insured's house[.]" (emphasis added).  That does not happen. Chubb does only one appraisal as a matter of course.  Chubb does "not do an appraisal again after" the policy is initially placed.  *Compare* Spencer Aff. at ¶ 7 (Dkt. 79) *with* Klein Dep. Tr. 22:10-18 (Dkt. 104 Ex. E, Tab 1)).  "Dkt." refers to docket entries in *Spagnola v. The Chubb Corp.*, No. 06 Civ. 9960 (S.D.N.Y.).  "JB Dkt." refers to docket entries in *Bernstein v. The Chubb Corp.*, No. 08 Civ. 0193 (S.D.N.Y.).

of particular construction materials. ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ That number is the initial valuation. Spagnola's appraisal is in the record,[18] as are, under seal, examples of the matrices Chubb uses to determine the labor and materials costs that yield the number.[19]

When the annual renewal occurs, however, Chubb does *not* conduct an appraisal, and it does not use the information it has obtained about the insured's particular house, although its regularly updated matrices – the same data used to determine the initial valuation – would permit it to do so. Instead, it relies on information about changing labor costs and materials costs in an area vastly larger than his neighborhood and without regard to the construction details of his house.

This can be proved by looking closely at evidence already in the record, namely the area specific matrices that Chubb has filed under seal. We have not been able to take discovery with respect to them, but the story they tell seems plain enough. These matrices set out Chubb's construction cost estimates for different areas. Look at Dkt. 103 Ex. 5 at DEF.01200, the Brooklyn Staten Island Non-Exclusive Construction Cost Matrix. ████████

████████████████████████████████████████████████████████████████████

---

[18]     Dkt. 103 Ex. 13.

[19]     Dkt. 103 Ex. 5 (filed under seal).

████████████████████████████████████████████████████████

██████████████████████████████████████████████

Next, look at Brooklyn Staten Island Exclusive Construction Cost Matrix, *id.*
at DEF.01201. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Thus, without revealing information under seal, in 2006, the cost of rebuilding an average
frame house was 117.3% higher in the "exclusive" community than in the non-exclusive one;
and the cost of rebuilding an average price veneer house is 132% more in the exclusive areas.
Looking at these data, all from year 2006, makes clear that these costs must certainly
"inflate" at different rates in different areas.

But Spencer's affidavit states that Chubb does not select costs and values
adjustments that distinguish among different types of construction, or by selecting one
inflation rate for the "non-exclusive" and for different "exclusive" zip codes.  Instead,
Chubb's Spencer avers: [20]

> For example, if construction costs in Staten Island increased
> eight percent from 2005 to 2006, that information would be used
> in establishing the inflation guard factor for the appropriate
> 2006 coverage amount for a home in Staten Island.

---

[20]     Spencer Aff. at ¶ 17 (Dkt. 79).

The matrices show, however, that █████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████

The record does not show how many jurisdictions New York State is carved

into, but we are already far away from anything remotely akin to an "appraised value" of the

*policyholder's* house. ███████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ But there is more.

The record shows that this detailed materials and labor costs information from

Chubb's appraisal department does not determine the "costs and values" adjustment. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[21]

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

[21]    Marques Dep. Tr. 26:22-27:4, 57:18-58:6 (Kirby Aff. Ex. A, Tab 2) (Dkt. 57 filed under seal).



This is "significant proof" that Chubb's "costs and values" process is not about producing inflation adjustments that are similar to an appraisal value for the property.

Discovery will show, we believe, that Marques consistently increased or rounded up the numbers delivered him by the appraisal department given his response that ███████████████████████████████ Because defendants and consequent Court orders constricted discovery, that presumption, if need be, must be ours. If discovery proved that hypothesis true, the concerns about remedies that disturbed this Court in its Rule 23(b)3 analysis would surely vanish. Chubb has no obligation to make costs and values adjustments at all; to the extent that it has raised valuations beyond what its own appraisers thought the evidence dictated, its liability to class members for the excess should be clear.

There is still more, however. Chubb operates through a number of subsidiaries. Masterpiece Policy manuals, describing how to calculate premiums, were produced in

discovery.[22] These show that ████████████████████████████████████

████████████████████████████████ [23] ████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ [24] ███████████████

████████████████████████████████████████████████████████ it will

provide powerful evidence that the costs and values process is a sham if nearby properties

insured by different subsidiaries have received different percentage "costs and values"

adjustment in the same time period. The Court has refused to permit discovery addressed to

this point.

       2.     We believe that the fact that Bernstein's coop policy's "cost and values"

adjustment for contents is so much higher than the CPI is itself "significant proof" that

Chubb is using adjustment processes that breach the contract.

---

[22]    *See infra* n.24.

[23]    This is, of course, if one wants to do it, a powerful way to discriminate against both people and neighborhoods. *See Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 63 (2007) (holding that the Fair Credit Reporting Act requires disclosure that a person's credit affected his assignment to a particular subsidiary.).

[24]    *See* October 7, 2011 Declaration of Andrew M. McNeela Ex. 1 (filed under seal),



To the extent that the record is sparse, however, the reason is because defendants refused to provide the information when it was demanded.[25] The most profound impact of *Wal-Mart* may lie in the reality that the more the courts require "proof" to be developed prior to class certification, the more important it is for plaintiffs to get full discovery.[26]

3.     Plaintiffs assert that the contract can properly be construed to require "costs and values" to be set by reference to the consumer price index, or a regionally adjusted consumer price index. This is a common issue of law. It was recognized as plausible by the Court of Appeals,[27] and Chubb adjusts coverages every second of every year of coverage save the very final one.

---

[25]     Following reversal, on November 6, 2009, plaintiffs served a deposition notice to examine:

> each corporate defendant by one or more officers, directors, or managing agents, or other persons who consent to testify on their behalves...who have knowledge respecting the subject of: changes in the amount of dwelling coverages. . . . upon renewals of Chubb Masterpiece homeowner's replacement cost policies for property located in the State of New York ("changes in coverage") "to reflect current costs and values" or "the current effect of inflation." The subject matter includes, but is not limited to, how those changes are and have been determined from January 1, 2000 to date.

Defendants advised that Messrs. Spencer and Marques would be produced pursuant to that notice. The Court barred this discovery. *See* Letter to Court dated Nov. 16, 2009 (Dkt. 71; JB Dkt. 11).

[26]     Thus, Great Northern refused discovery on merits-based ground to 17 document requests, 100 requests for admission and 14 interrogatories.

[27]     *Spagnola*, 574 F.3d at 72.

Favoring this construction is the preference for giving contract language objective meaning wherever possible, and rejecting an alternative that "cost and values" permits Chubb to pick whatever numbers it chooses, and then, on a theory that a stopped clock is right twice a day, say that plaintiffs must prove that each particular number was wrong. Further, Chubb represents in this litigation that "costs and values" is an inflation guard. Yet the only place the word inflation is used in the entire contract is in connection with the consumer price index. And, as stated, the consumer price index is the mechanism the contract uses to adjust for inflation throughout the year, signaling the appropriateness of using it to measure changing costs and values.

Most important, however, the record contains strong evidence that Chubb represents to the world that this is what the term costs and values means. *Chubb's agent* e-mailed Spagnola that she had contacted Chubb for the specific purpose of determining whether the clause could be removed, and was told that the valuation was set by his regional consumer price index.[28] The insurance agent who sold Bernstein his policy identified the consumer price index language as the inflation guard.[29] Equally important are the questions Chubb has refused to answer on the grounds that they relate to the merits. It refuses to disclose communications they have had with the New York Insurance Department about the

---

[28] Dkt. 103 Ex. 15.

[29] Klein Dep. Tr. 21:13-22 (Dkt. 104 Ex. E, Tab 1).

meaning of the term.[30]  Discovery will disclose Chubb's directions about what to tell customers if they ask about it.  Extrinsic evidence showing that Chubb "holds out" a meaning of costs and values is plainly important for construing the term.

4.      There also is finally the common question of whether Chubb breaches the contract by setting homeowner's contents adjustment at 50% of house reconstruction costs.  Because Chubb has estimated that construction labor costs have risen so dramatically, the contents coverage becomes totally unrelated to true replacement and repair costs.  Indeed, for many household products, such as televisions and computers, prices have dropped substantially.  Yet, as Chubb inflated the cost of replacing Bernstein's vacation home, they increased his contents coverage in lock-step, so that Chubb was charging Bernstein for over $1,000,000 in supposed contents to cover property at a beach house.

As a matter of *contract* interpretation, it seems inconceivable that policy language that makes specific reference to adjusting the "costs and values" *of contents* can somehow be read to justify the practice of setting contents coverage in a manner that ignores changes in costs and values of contents.  Yet that is what Chubb does.

---

[30]      Defs' Objections and Responses to Plaintiff's Requests for Documents Pursuant to Rules 26, 34 at 5 (Mar. 14, 2007).

## CONCLUSION

For the foregoing reasons, the class should be held to satisfy Rule 23(a); and

that the Court should invite briefing on any remaining class action issues.


Dated: October 7, 2011

Respectfully submitted,

**KIRBY McINERNEY LLP**

Andrew M. McNeela
Peter S. Linden
Edward M. Varga, III
Surya Palaniappan
825 Third Avenue
New York, New York  10022
Tel: (212) 371-6600
Fax: (212) 751-2540

*Attorneys for Plaintiffs*

Of counsel:

Harold Edgar, Esq.
435 West 116th Street
New York, New York  10027

**LAW OFFICES OF KENNETH ELAN, ESQ.**
Kenneth Elan, Esq.
217 Broadway
New York, NY  10007

Attachment

--- F.R.D. ----, 2011 WL 4336664 (S.D.N.Y.)
**(Cite as: 2011 WL 4336664 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Thomas JERMYN, on behalf of himself and all others similarly situated, Plaintiff,
v.
BEST BUY STORES, L.P., Defendant.

No. 08 Civ. 214(CM).
Sept. 15, 2011.

Gary Steven Graifman, Michael Louis Braunstein, Kantrowitz Goldhamer & Graifman, P.C., Chestnut Ridge, NY, Michael Scott Green, Green & Pagano, LLP, East Brunswick, NJ, Daniel Edward Seltz, David S. Stellings, Lieff Cabraser Heimann & Bernstein LLP, New York, NY, for Plaintiff.

Jennifer G. Daugherty, Anne Michele Lockner, Jan M. Conlin, Jennifer M. Robbins, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, Todd C. Norbitz, Yonaton Aronoff, Foley & Lardner, LLP, New York, NY, for Defendant.

MEMORANDUM ORDER DENYING DEFENDANT'S SECOND MOTION TO DECERTIFY THE CLASS
McMAHON, District Judge:
I. Introduction

**\*1** Before the court is Defendant Best Buy's second motion to decertify the Plaintiffs' class. For background information, the reader is referred to the first six published decisions in this case. *Jermyn v. Best Buy Stores, L.P.,* 256 F.R.D. 418 (S.D.N.Y.2009) ("*Jermyn I* "): *Jermyn v. Best Buy Stores L.P.,* 2010 WL 2545757 (S.D.N.Y. May 25, 2010) (" *Jermyn II* "): *Jermyn v. Best Buy Stores L.P.,* 2010 WL 3911509 (S.D.N.Y. Sept. 28, 2010) ("*Jermyn III* "); *Jermyn v. Best Buy Stores L.P.,* 2010 WL 5187746 (S.D.N.Y Dec. 6, 2010) (" *Jermyn IV* "): *Jermyn v. Best Buy Stores, L.P.,* 2011 WL 280798 (S.D.N.Y. Jan. 18, 2011) ("*Jermyn V*

"); and *Jermyn v. Best Buy Stores, L.P.,* 2011 WL 2119725 (S.D.N.Y. May 24, 2011) ("*Jermyn VI* ").

As pertinent here, Plaintiffs are New York customers of Defendant who were refused a "price match" at Defendant's store. Defendant advertises that it will meet any competitor's price on products it sells, subject to several conditions (the "Price Match Guarantee"). *See generally Jermyn I,* 256 F.R.D. at 424–25.

This court certified as a class New York customers of Defendant who were denied valid Price Matches, under Rule 23(b)(2) and (b)(3). I identified as a common question whether, as alleged by plaintiffs, Defendant maintains and communicates to local branches a corporate policy of denying valid price matches (the "Anti–Price Matching Policy"). If it does, then it is liable under New York's General Business Law for misleading consumers. *Id.* at 429–31. Subsequently, this court denied Defendant's motion for summary judgment, finding that the question whether such a policy exists is for the jury. *Jermyn V,* 2011 WL 280798, at *2.

Defendant argues that the class must be decertified in light of the United States Supreme Court's recent decision in *Wal– Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541 (2011). For the reasons discussed below, the motion is denied.

II. Discussion
*A. Standard for decertification*

"[A] district court may decertify a class if it appears that the requirements of Rule 23 are not in fact met." *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 572 (2d Cir.1982); *see also Monaco v. Stone,* 187 F.R.D. 50, 59 (E.D.N.Y.1999) ("A class may be decertified if later events demonstrate that the reasons for granting class certification no longer exist or never existed."). However, even assuming Plaintiffs bear the burden of demonstrating that the requirements of Rule 23 continue to be met,[FN1]

"the Court may not disturb its prior [certification] findings absent 'some significant intervening event,' or 'a showing of compelling reasons to reexamine the question.' " *Doe v. Karadzic,* 192 F.R.D. 133, 136–137 (S.D.N.Y.2000) (internal citations omitted). Courts faced with a motion to decertify must also take account of the progression of the litigation. *Langley v. Coughlin,* 715 F.Supp. 522, 552 (S.D.N.Y.1989) ("[T]he Court must take into consideration that an eve-of-trial decertification could adversely and unfairly prejudice class members, who may be unable to protect their own interests."); *see also Woe v. Cuomo,* 729 F.2d 96, 107 (2d Cir.1984) (finding abuse of discretion where district court decertified the class after granting summary judgment in part).

> FN1. There is authority in this Circuit pointing either way. *Compare In re Vivendi Universal, S.A. Securities Litigation,* 2009 WL 855799, at *3 (S.D.N.Y. Mar. 31, 2009) ("[D]ecertifying or redefining the scope of a class should only be done where defendants have met their 'heavy burden' of proving the necessity of taking such a 'drastic' step") (quoting *Gordon v. Hunt,* 117 F.R.D. 58, 61 (S.D.N.Y.1987), with *Doe v. Karadzic,* 192 F.R.D. 133, 136–137 (S.D.N.Y.2000) (acknowledging that "at least one district court has concluded that the burden of persuasion remains throughout the litigation with the party desiring to maintain certification") (citing *Smith v. Armstrong,* 968 F.Supp. 50, 53 (D.Conn.1997)).

**\*2** Defendant identifies one "intervening event" which it claims is sufficiently "significant" to demonstrate that the Rule 23 requirements are not, in fact, met: the Supreme Court's recent decision in *Wal–Mart v. Dukes,* 131 S.Ct. at 2541 (" *Dukes* " herein). A change in controlling law can provide a basis for decertification. *See, e.g., In re Grand Theft Auto Video Game Consumer Litigation,* 251 F.R.D. 139 (S.D.N.Y.2008) (decertifying

in light of intervening Second Circuit decision); *Doe,* 192 F.R.D. at 133 (decertifying in light of intervening United States Supreme Court decision).

As will be seen, the recent *Dukes* decision does undermine Second Circuit precedent this Court relied on in certifying the Rule 23(b)(2) "injunction class", requiring reexamination of that issue. However, upon reexamination, this Court's certification of two separate classes, seeking distinct relief, is entirely consistent with *Dukes.* Moreover, *Dukes* makes no new law that impacts in any way this Court's certification of the Rule 23(b)(3) "damages class." Thus, the class is certified separately under Rules 23(b)(2) Rule 23(b)(3), and Defendant's motion is denied.

*B. The Supreme Court's decision in* Dukes

As noted, Defendant relies on the Supreme Court's recent decision in *Dukes.* There, the Court decertified a Rule 23(b)(2) class consisting of a 1.5 million current and former employees of **Wal–Mart**, on two grounds. First, the Court held that a Rule 23(a) prerequisite—the requirement that a common question of law or fact unite the class—was not satisfied. Second, it held that an injunction class under Rule 23(b)(2) was not appropriate when accompanied by class claims for individualized money damages that are more than merely "incidental" to the injunctive relief.

The issue on this motion is whether these holdings change the legal circumstances in a way that shows that the requirements of Rule 23 certification are not in fact met. *Sirota,* 673 F.2d at 572. It is therefore necessary to examine *Dukes* in some detail.

The named plaintiffs were three current and former female employers of **Wal–Mart**, the country's largest private employer. Each alleged that she suffered unlawful sexual discrimination in pay and promotion, and sought class certification to bring Title VII claims on behalf of all current and former female employees against **Wal–Mart**.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Importantly, plaintiffs' theory was not that **Wal–Mart** had any "express corporate policy against the advancement of women," *Dukes*, 131 S.Ct. at 2548, or a "uniform employment practice" that violated the law, *id. at 2554*. To the contrary, plaintiffs acknowledged that **Wal–Mart's** general corporate policy was (1) to allow local managers discretion over their employees' pay and promotion, and (2) to forbid illegal discrimination in the exercise of that discretion. *Id. at 2547, 2553*. Instead, plaintiffs' theory was that the policy of allowing discretion, combined with a "corporate culture" of sexual stereotyping, caused women to be disfavored in the workplace—in other words, the corporate "hands off" policy created a disparate impact on women. *Id. at 2548; cf. General Telephone Co. of Southwest v. Falcon, 457 U.S. 147 (1982)* ("*Falcon*" herein).

**\*3** The District Court certified the class under Rule 23(b)(2) (an "injunction class"), relying for its finding of "commonality" on three types of evidence: statistics showing pay and promotion disparities between men and women; anecdotal evidence from about 120 women; and expert testimony from a sociologist to the effect that **Wal–Mart's** corporate culture rendered it vulnerable to discrimination in discretionary pay and promotion decision-making. *Dukes, 131 S.Ct. at 2549*. The Ninth Circuit, sitting en banc, affirmed the certification, finding that the plaintiffs' evidence established commonality by raising the issue "whether **Wal–Mart's** female employees nationwide were subjected to a single set of corporate policies (not merely a number of independent discriminatory acts) that may have worked to unlawfully discriminate against them in violation of Title VII." *Id. at 2549*. The court did not certify a Rule 23(b)(3) class.

The class certified made claims for injunctive and declaratory relief, as well as punitive damages and back pay, although class members did not assert claims for compensatory damages. The Ninth Circuit held that claims for monetary relief did not defeat certification under Rule 23(b)(2), because

"they did not 'predominat[e]' over the requests for declaratory and injunctive relief, meaning they were not 'superior in strength, influence, or authority' to the nonmonetary claims." *Id. at 2550* (quoting *603 F.3d 571, 616 (9th Cir.2010)* (en banc)).

*C. Commonality*

The first *Dukes* holding pertinent to this motion is that the class described failed the threshold "commonality" requirement of *Federal Rule of Civil Procedure 23(a)(2)*, which requires that "there [be] questions of law or fact common to the class." Summarizing the commonality requirement for a five-Justice majority, Justice Scalia said that:

Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," (citation omitted). This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways—by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

**\*4** *Dukes, 131 S.Ct. at 2551*.

The Supreme Court held that such a "common contention" was lacking in *Dukes* because the basis for liability—the "glue" holding all of the individual class member's claims together—was not merely

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

disfavor in pay and promotion, but the *reason why* each class member was disfavored. When the ability to recover hinges on the reason why a particular action was taken, answering the question in one case will not necessarily do anything to advance the resolution of that same issue in another class member's case. *Id.* at 2561 ("What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (Emphasis in original). Thus, the fact that hundreds or thousands of women were disfavored in pay and promotion did not present a common question unless it was the result of a discriminatory practice or policy that motivated each decision, and therefore made it illegal under Title VII.

The Court rested its analysis on its earlier decision in *Falcon,* 457 U.S. at 157. There, the Court held that to demonstrate a common question in his Title VII case, the class proponent was required to "bridge the gap" between his individual allegations of discrimination and the existence of a class of workers who suffered the same injury, by showing one of two things: (1) that a testing procedure used to inform employment decisions was itself discriminatory, or (2) "**significant proof** that the defendant employer operated under a "general policy of' discrimination" that affected the putative class members the same way. *See id.* at 158–60, n. 15.

In *Dukes,* neither basis for finding commonality among the alleged acts of discrimination existed: testing was not in issue, and the Court found that "**significant proof**" of "general policy of discrimination" was "entirely absent":

The only corporate policy that the plaintiffs' evidence convincingly establishes is **Wal – Mart's** "policy" of *allowing discretion* by local supervisors over employment matters. On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices.

*Id.* at 2553–554 (emphasis in original). Without identifying some kind of corporate guidance that led to the local managers' discretion being exercised in a uniformly discriminatory way, the Court reasoned, there was no common thread of liability that tied together each class member's distinct claim, and tied them all to **Wal – Mart's** corporate management. Although plaintiffs' sociologist tried to provide this "guidance" in the form of a "social framework analysis", the court rejected that evidence because it "does nothing to advance respondents' case." *Id.* at 2554. In particular, the expert admitted that "he could not calculate whether 0.5 percent or 95 percent of the employment decisions at **Wal – Mart** might be determined by stereotyped thinking"; but, the Supreme Court held,

**\*5** "[W]hether 0.5 percent or 95 percent of the employment decisions at **Wal – Mart** might be determined by stereotyped thinking" is the essential question on which respondents' theory of commonality depends. If [the expert] admittedly has no answer to that question, we can safely disregard what he has to say. It is worlds away from "**significant proof**" that **Wal – Mart** "operated under a general policy of discrimination."

*Id.* at 2553, 2554.

Plaintiffs' contention that an unspoken policy of discrimination, which seeped down from the corporate to the local level, could be inferred from statistical and anecdotal evidence that women fared poorly in pay and promotion decisions across **Wal–Mart's** stores was also rejected; the Court determined that this evidence of a surreptitious general corporate policy fell "well short." *Id.* at 2555. FN2 The Court therefore concluded that, "Because respondents provide no convincing proof of a companywide discriminatory pay and promotion policy, we have concluded that they have not established the existence of any common question." *Id.* at 2556–557.

FN2. The majority read the Court's prior cases on "delegated authority" liability to require more than just delegated discretion

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

and disparate impact; in addition, to prove liability on a theory of delegated authority, the plaintiff must challenge a "specific employment practice." *Dukes,* 131 S.Ct. at 2555–556. Justice Ginsberg, in dissent, suggests that this additional requirement is novel. *See Dukes,* 131 S.Ct. at 2564–65 (Ginsburg, J., dissenting in part).

If the reader wonders exactly what *Dukes'* commonality analysis has to do with this case, s/he is likely not alone. *Dukes* can be read as a straightforward application of *Falcon:* plaintiffs were required to identify "**significant proof**" of a general corporate policy of discrimination. Although the policy of allowing discretion can suffice as such a policy, two additional things must be shown: (1) the delegation of discretion creates a disparate impact, and (2) some "specific employment practice" is the source of discrimination. The Supreme Court held that there was no **significant proof** of any general corporate policy of discrimination, and that the delegation proof was unaccompanied by a "specific employment practice" that led to a disparate impact. *Dukes,* 131 S.Ct. at 2555.

Defendant tries to import these Title VII pleading requirements to Plaintiffs' claims, which allege deceptive business practices under New York's General Business Law ("GBL"). It fails for two reasons. First, these additional requirements are designed for and unique to the context of employment discrimination. They are necessary because the employer's motivation is crucial to establishing liability, and therefore to the common liability necessary to glue the plaintiff class together. In the deceptive business practice context, by contrast, the "why" is less relevant, if it is relevant at all. It is enough for liability that (1) Defendant advertises its Price Match Guarantee, and (2) secretly maintains an Anti–Price Matching Policy, thereby (3) deceiving the public. Unlike discrimination claims, plaintiffs' GBL claims do not necessarily depend on any specific motivation. *See Spagnola v. Chubb Corp.,* 574 F.3d 64, 74 (2d Cir.2009) ("Deceptive acts are defined objectively as acts likely to mislead a reasonable consumer acting reasonably under the circumstances.") (internal citations, quotation marks, and alterations omitted).

**\*6** However, to the extent Plaintiffs here are required to identify a specific, illegal corporate policy rendering Defendant liable to all the class members, they have manifestly done so. Plaintiffs allege that Defendant communicated to local branches a corporate policy of denying valid price match requests, contrary to its advertised Price Match Guarantee. If that allegation were proved, it would render Defendant liable to every class member who suffered under the practice. Indeed, what Plaintiffs here allege is precisely what is missing in *Dukes,* 131 S.Ct. at 2548 ("These plaintiffs ... do not allege that **Wal – Mart** has any express corporate policy against the advancement of women."). Had the *Dukes* plaintiffs actually alleged a general, non-discretionary corporate policy disfavoring women and offered some proof that such a policy existed, then obviously the case could have and would have proceeded as a class action. What the Supreme Court held was that the plaintiffs failed to present "**significant proof**" of such a policy.

Here, on the other hand, Plaintiffs have presented significant (indeed, ample) proof that the illegal policy alleged in fact exists. I have already so held, not once, but at least three times. The basis for that holding is set forth in both the original certification order and the denial of Defendant's motion for summary judgment; it will not be repeated again here. *See Jermyn I,* 256 F.R.D. at 429–433; *Jermyn VI,* 2011 WL 2119725, at *1–4. The fact that the arguments and the analysis on this motion are essentially identical only serves to highlight the futility of Defendant's motion seeking reconsideration on the basis of *Dukes*—a case that is only relevant to the point on which it is most clearly distinguishable. *See Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co., Inc.,* —— F.Supp.2d ——, 2011 WL 3652477, at *7 (S.D.N.Y. Aug. 22, 2011) ("[T]he facts in **Wal –**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Mart*, a case in which three named plaintiffs sought to represent a class of 1.5 million women in an employment discrimination suit, are entirely distinguishable from the facts of the instant securities class action.").

Defendant's arguments on this motion persistently conflate the issues of liability, or legal injury, and damages. It fails to appreciate that by deceiving the public alone it would have committed a legal wrong against anyone who can prove that he was injured thereby. If, in *Dukes*, the plaintiffs had sufficiently proved a general corporate policy of sexual discrimination, class treatment would have been appropriate; as explained, that policy would be the "thread" or "glue" tying all of the plaintiff's injuries together. The mere fact that some women (only putatively) in the class were, in fact, turned down for non-discriminatory reasons would not preclude certification in that case, any more than the fact that one woman's adverse treatment damaged her in the amount of $100, while another woman's damaged her in the amount of $500. One thing that *Dukes* clearly does not change is that "for purposes of Rule 23(a)(2) even a single common question will do." 131 S.Ct. at 2556 (internal quotation marks and alterations omitted). Here, the **significant proof** an illegal, centralized corporate policy presents the requisite common question.

**\*7** In conclusion, unlike the *Dukes* plaintiffs, Plaintiffs here have a theory that ties the class members to each other and to the Defendant: that Defendant maintains an Anti–Price Matching Policy illegal under New York's GBL. Proving that theory, without more, establishes Defendant's liability to all of the class members. Moreover, unlike the *Dukes* plaintiffs, Plaintiffs here have offered substantial proof that such a policy in fact existed, thereby raising a prima facie inference of broad-based, classwide injury.

Thus, the intervening event of *Dukes* does not demonstrate a lack of commonality, and Defendant's motion to decertify on that basis is denied.

*D. Certification of the Rule 23(b)(2) class*

*Dukes'* second holding, concerning the effect of claims for monetary relief on the court's certification of an injunction class under Rule 23(b)(2) is potentially pertinent to this case.

While the Court split 5–4 on the commonality issue, it was unanimous that the plaintiffs' claims for back pay should not have been certified as part of a Rule 23(b)(2) class. Here is what it said:

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." One possible reading of this provision is that it applies *only* to requests for such injunctive or declaratory relief and does not authorize the class certification of monetary claims at all. We need not reach that broader question in this case, because we think that, at a minimum, claims for *individualized* relief (like the backpay at issue here) do not satisfy the Rule. The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." (citation omitted). In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. *Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.*

*Dukes,* 131 S.Ct. at 2557 (final emphasis added). The Court concluded that "the combination of individualized and classwide relief in a(b)(2) class" is inconsistent with the history and structure of the rule, and forbade any such combination where the monetary component was more than merely

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

"incidental" to the injunctive relief. *Id.* at 2557–560. In the course of doing so, it rejected Court of Appeals precedent, relied on by the Ninth Circuit upholding certification, that permitted combination (b)(2) classes so long as the individualized monetary relief does not "predominate" over injunctive relief. *See id.; see also Dukes,* 673 F.3d at 616 (citing *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 164 (2d Cir.2001)).

**\*8** This Circuit had long followed the "predominates" approach rejected in *Dukes. See U.S. v. City of New York,* —— F.R.D. ——, 2011 WL 2680474, at \*7–8 (E.D.N.Y. July 8, 2011) (analyzing *Robinson* and *Dukes* ). Indeed, this court relied on that law when certifying Plaintiffs' class under Rule 23(b)(2). *See Jermyn I,* 256 F.R.D. at 433–34. Thus, it is appropriate to re-examine the issue of Rule 23(b)(2) certification in the wake of *Dukes.*

However, such a reexamination reveals that the abrogation of *Robinson* does not affect certification in this case. *Dukes,* like *Robinson,* was concerned with Rule 23(b)(2) classes that sought both injunctive and monetary relief. In this case, by contrast, I have certified a class both under Rule 23(b)(2) and under Rule 23(b)(3), after finding that the additional requirements of (b)(3)—"predominance" of common questions over individualized questions and "superiority" of class resolution—are satisfied here. *Jermyn I,* 256 F.R.D. at 434–437. In this case, unlike *Dukes,* a(b)(2) class is not seeking monetary relief, but only an injunction against further statutory violations. It is a separately certified (b)(3) class that seeks money damages. Because violation of the GBL entitles both classes to relief, only one liability trial will need to be held to determine the existence *vel non* of the Anti–Price Matching Policy, *see* GBL 349(h).

Defendant repeats its earlier argument that it will be impossible, or unconstitutional, or uneconomical to resolve the individual claims for damages in the Rule 23(b)(3) class. This court addressed these arguments in its discussion of "ascertainability" in the original order granting certification. *Jermyn I,* 256 F.R.D. at 433–34. *Dukes* says nothing about this issue, and therefore provides no basis for re-examining the previous holding.

### III. Conclusion

The motion is therefore denied. The Clerk of the Court is directed to close the motions at Docket Nos. 110 and 189.

S.D.N.Y.,2011.
Jermyn v. Best Buy Stores, L.P.
--- F.R.D. ----, 2011 WL 4336664 (S.D.N.Y.)

END OF DOCUMENT