DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500 (Telephone)
(212) 335-4501 (Facsimile)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
FRED SPAGNOLA, individually and on
behalf of all those similarly situated

                Plaintiff,

      -against-                     06 Civ. 9960 (HB)

THE CHUBB CORPORATION, FEDERAL
INSURANCE COMPANY, GREAT
NORTHERN INSURANCE COMPANY,
JOHN D. FINNEGAN and THOMAS F.
MOTAMED,

                Defendants.
----------------------------------------------------------x
JONATHAN A. BERNSTEIN, individually
and on behalf of all those similarly situated,

                Plaintiff,

      -against-                     08 Civ. 00193 (HB)

THE CHUBB CORPORATION, FEDERAL
INSURANCE COMPANY, GREAT
NORTHERN INSURANCE COMPANY,
JOHN D. FINNEGAN and THOMAS F.
MOTAMED,

                Defendants.
----------------------------------------------------------x

**DEFENDANTS' MEMORANDUM OF LAW REGARDING
THE SECOND CIRCUIT'S MANDATE AND THIS
COURT'S ORDER OF SEPTEMBER 22, 2011**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND ..................................................................................................3

    A.    The Policy ...............................................................................................3

    B.    Procedural Background .........................................................................4

III.   ARGUMENT ......................................................................................................7

    A.    Wal-Mart Stores, Inc. v. Dukes ............................................................9

    B.    The Plaintiffs Did Not and Cannot Satisfy the Dukes Commonality
        Standard ...............................................................................................10

        1.    As Framed by the Plaintiffs, The Central Question of the Policy's
             Interpretation Is Not Susceptible to Classwide Proof............................11

             a.    Plaintiffs' CPI Theory Is Not Susceptible to Classwide
                 Proof .......................................................................................12

             b.    Plaintiffs' Alternative Policy Interpretation Is Not
                 Susceptible to Classwide Proof ..............................................18

        2.    Whether Great Northern's Methodology Breached the Policy is
             Not a "Common Question" Susceptible to Classwide Proof..................20

IV.   CONCLUSION ..................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Adams v. Kansas City Life Ins. Co.,
    192 F.R.D. 274 (W.D. Mo. 2000).............................................................................15

Avritt v. Reliastar Life Ins. Co.,
    615 F.3d 1023 (8th Cir. 2010)..........................................................................14, 15

Beller v. William Penn Life Ins. Co. of New York,
    8 A.D.3d 310, 778 N.Y.S.2d 82 (App. Div. 2004)...................................................6

Bruckmann, Rosser, Sherrill & Co., L.P. v. Marsh USA, Inc.,
    87 A.D.3d 65, 926 N.Y.S.2d 471 (N.Y. App. Div. 1st Dept. 2011)......................18

Engel v. Scully & Scully, Inc.,
    2011 WL 4091468 (S.D.N.Y. Sept. 14, 2011) ......................................................17

Foot Locker, Inc. v. Omni Funding Corp. of America,
    78 A.D.3d 513, 911 N.Y.S.2d 344 (N.Y. App. Div. 1st Dept. 2010)....................14

General Telephone Co. of Southwest v. Falcon,
    457 U.S. 147, 102 S.Ct. 2364 (1982) .....................................................................9

Gray v. Hearst Commc'ns, Inc.,
    2011 WL 3734413 (4th Cir. 2011) ........................................................................17

Haber v. St. Paul Guardian Ins. Co.,
    137 F.3d 691 (2d Cir. 1998) ..................................................................................16

Haynes v. Planet Automall, Inc.,
    2011 WL 3555613 (E.D.N.Y. Aug. 12, 2011) ......................................................16

In re Prudential Lines,
    158 F.3d 65 (2d Cir. 1998) ....................................................................................16

Jermyn v. Best Buy Stores,
    2011 WL 433664 (S.D.N.Y. Sept. 15, 2011) ........................................................17

McManus v. Bd. of Educ. Of Hempstead Union Free School Dist.,
    87 N.Y.2d 183 (1995)............................................................................................16

Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.,
    472 F.3d 33 (2d Cir. 2006) ....................................................................................13

Salon Fad v. L'Oreal USA, Inc.,
    2011 WL 4089902 (S.D.N.Y. Sept. 14, 2011) ...................................................................... 17

Seiden Assocs., Inc. v. ANC Holdings, Inc.,
    959 F.2d 425 (2d Cir. 1992) ................................................................................................... 13

Spagnola v. Chubb Corp.,
    No. 06 Civ. 9960(HB), 2007 WL 927198 (S.D.N.Y. March 27, 2007) ......................... 4, 5, 13

Spagnola v. Chubb Corp.,
    264 F.R.D. 76 (S.D.N.Y. 2010) ...................................................................................... passim

Spagnola v. Chubb Corp.,
    574 F.3d 64 (2d Cir. 2009) ............................................................................................. passim

Town of Hempstead v. Incorporated Vill. of Freeport,
    15 A.D.3d 567 (N.Y. App. Div. 2d Dep't 2005) .................................................................... 16

Trombley v. Bank of America,
    2011 WL 3273930 (D. R.I. July 29, 2011) ............................................................................ 17

Wal-Mart v. Dukes,
    131 S. Ct. 2541 (2011) ................................................................................................... passim


**OTHER AUTHORITIES**

Rule 23 ............................................................................................................................... passim

Restatement 2d Contracts § 203 ............................................................................................... 18

# I.    <u>INTRODUCTION</u>

This case concerns a homeowners' insurance policy ("Policies" or the "Policy") issued by Great Northern Insurance Company ("Great Northern").  In the event of a loss to one's home or contents, homeowners' insurance protects homeowners by paying the costs necessary to reconstruct or replace their property.  To help ensure that this protection is adequate year after year, the Policy contains an "inflation guard" provision which provides that Great Northern may change the Policy's stated amount of coverage "when appraisals are conducted <u>and when the policy is renewed, to reflect current costs and values</u>."  Ex. 3, at B-1 (emphasis added).[1]

The plaintiffs allege that Great Northern breached the Policy by increasing coverage amounts at annual renewal.  Even though the two named plaintiffs advance two disparate interpretations of the Policy, they sought to bring their contract claims on behalf of a class of all New York policyholders.  This Court denied class certification, finding that, for multiple reasons, the plaintiffs failed to satisfy Rule 23(a)(4)'s adequacy requirement and Rule 23(b)(3)'s predominance and superiority requirements.  <u>Spagnola v. Chubb Corp.</u>, 264 F.R.D. 76, 95-97, 98-99 (S.D.N.Y. 2010) (the "January 7 Order").  Although it gave this Court "some pause" that the plaintiffs advanced diametrically opposed interpretations of the relevant Policy language, the Court concluded that the plaintiffs satisfied their burden under Rule 23(a)(2)'s commonality requirement "if only barely."  <u>Id</u>. at 94.  The U.S. Supreme Court's subsequent decision in <u>Wal-Mart v. Dukes</u>, 131 S. Ct. 2541 (2011), mandates a different conclusion.[2]

Prior to <u>Dukes</u>, commonality was generally considered a low threshold, the satisfaction of which was often assumed.  <u>Dukes</u>, however, has changed that.  In <u>Dukes</u>, the Supreme Court reversed class certification of a Title VII putative class action finding, among other things, that

---

[1]    Unless otherwise indicated, references to Exhibits shall refer to the Exhibits to the Declaration of Keara M. Gordon in Support of the Defendants' Motion to Deny Class Certification, dated Nov. 20, 2009.

[2]    The plaintiffs' position – i.e, that <u>Dukes</u> merely affirms this Court's original finding of commonality – is not tenable in light of the Second Circuit's mandate, which vacated the January 7 Order and remanded the matter for further consideration in light of <u>Dukes</u>.  The Second Circuit issued that mandate after the plaintiffs' appeal from the January 7 Order was fully briefed and only weeks before oral argument.  It is not reasonable to suggest that the Court would have taken such action if it believed that <u>Dukes</u> had no effect on the January 7 Order.

the plaintiffs failed to satisfy Rule 23(a)(2)'s commonality requirement.  In doing so, the Court effectively raised the bar for commonality and made clear that all of Rule 23's requirements are subject to rigorous scrutiny.  Specifically, it reiterated that the "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Dukes, 131 S. Ct. at 2550.  And, the Court clarified that commonality cannot be established by the mere recital of questions "common" to the class; rather, plaintiffs have to demonstrate affirmatively the existence of at least one common question that is central to their claim and can be answered on a classwide basis.  Id. at 2551.  In this case, as in Dukes, the plaintiffs failed to satisfy that standard.

Here, the plaintiffs claim that when Great Northern renewed their Policies each year, its coverage increases did not "reflect current costs and values" because of the manner in which it calculated those increases.  Thus, the threshold (and highly disputed) question in this case is what that Policy language means – i.e., whether it dictated a particular method by which annual increases had to be made and, if so, what method?  In the typical breach of contract case, this might be a common question answerable on a classwide basis.  This, however, is not such a case.

Although the purpose of the Policy is to provide the insured with comprehensive coverage in the face of loss and rising costs, the plaintiffs have asked this Court to interpret the Policy in a rigid way (i.e., to mean increases are controlled by the Consumer Price Index ("CPI")) that:  (1) is inconsistent with the Policy's express terms; (2) would frustrate its very purpose; (3) this Court has already rejected; and (4) one of the named plaintiffs testified was contrary to his understanding.  The plaintiffs also proffered an alternative, mutually exclusive, interpretation of the Policy, but failed to provide this Court with any coherent explanation of how they would pursue either theory on a classwide basis.  Nor, as set forth below, can they.  The plaintiffs cannot establish commonality and the January 7 Order should be revised accordingly.

## II.    BACKGROUND

**A.    The Policy.**    At issue are homeowners' insurance policies issued by Great Northern respecting New York property.[3]   When the Policy is first issued and at annual renewal, the insured receives documents stating, among other things, that year's coverage amount for the dwelling and contents, and the premiums owed.[4]   At Policy issuance, the house coverage amount reflects information from the policyholder and/or broker concerning the value of the house (which may be based on its market value, rather than reconstruction cost).   Spencer Aff. at ¶ 7. Then, a replacement cost appraisal is conducted of the insured's house, which takes into account its individual characteristics including age, size, type of construction and special features.   Id. Pricing information may be gathered from other sources including the insured, past experience, building contractors, architects, designers or internet research.   Id.   The coverage amount may be adjusted to reflect the estimated reconstruction costs based on the results of the appraisal.   Id.

The amount of contents coverage is set by reference to the amount of dwelling coverage, which is generally 50 percent of house coverage, although each insured may select a different percentage based on his or her understanding of the particular value of his or her contents. Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification ("Pl. Cert. Memo."), Ex., E, Tab 1 at 18:2-5; Spencer Aff. at ¶ 22.   Although this practice is not expressly articulated in the Policy, it is evident by even a cursory glance at the policy forms, see, e.g., Ex. 6, at DEF00015, Ex. 7, at DEF00269, and Ex. 8, at DEF00289, and as Mr. Bernstein's broker testified, it is a standard industry practice.   See Pl. Cert. Memo., Ex., E, Tab 1 at 18:2-22 ("Chubb didn't do appraisals of contents.   Contents were always done as a percentage of dwelling, as it's done with every other insurance company") (emphasis added).

---

[3]    Great Northern is a subsidiary of The Chubb Corporation which, in turn, is a holding company that does not market, sell or underwrite insurance policies.   Affidavit of Scott Spencer in Support of Defendants' Motion to Deny Class Certification ("Spencer Aff."), Spagnola Dkt. No. 79, at ¶ 4.

[4]    Policies that insure homes cover both dwelling and contents.   For policies that insure apartments, condominiums or cooperatives, only contents are typically covered.   Spencer Aff. ¶ 22.

Because the cost of reconstructing one's home or replacing one's contents does not remain static, neither does the coverage amount.  Rather, the Policy provides that the insurer may change the coverage amount "when appraisals are conducted and when the policy is renewed, to reflect current costs and values."  Ex. 3, at B-1.[5]  The purpose of this provision is to help coverage "'keep pace with inflation and prevent underinsurance.'"  Spagnola v. Chubb Corp., 574 F.3d 64, 70 (2d Cir. 2009) (approving this Court's March 27, 2007 Opinion).  In keeping with this purpose, the Policy "'does not and for the insured's protection, cannot specify' the amount of the future coverage increases in the original policy."  Id.

**B.    Procedural Background.**  Mr. Spagnola commenced this case on September 7, 2006.  In the four months that followed, Mr. Spagnola moved for class certification and also amended his complaint three times.  See Spagnola v. Chubb Corp. Dkt No. 12, 16, and 28.  While Mr. Spagnola's claims morphed over time, in summary, Mr. Spagnola alleged that Great Northern violated his Policy by increasing coverage each year:  (1) without his consent; (2) in excess of CPI; and (3) in violation of Section 3425 of New York's Insurance Law.  Spagnola v. Chubb Corp., No. 06 Civ. 9960(HB), 2007 WL 927198, at *2 (S.D.N.Y. March 27, 2007).

In January of 2007, the defendants moved to dismiss what was then the fourth iteration of Mr. Spagnola's complaint.  Spagnola Dkt. No. 33.  While that motion was pending, the parties conducted class discovery.   Mr. Spagnola deposed four representatives of the defendants (including Scott Spencer (Worldwide Appraisal Manager) and John Marques (Product and Pricing Manager)) and served extensive written discovery requests.  The defendants deposed Mr.

---

[5]      In the interim period between annual renewals of the Policy, the amount of coverage typically remains unchanged.  However, in the event of a loss during the policy period, the Policy separately provides – at no additional cost to the insured – for limited intermediate protection against the risk that inflation has increased the cost of replacing home or contents.  The Policy does this by stating:  "During the policy period, the amount of coverage will be increased daily to reflect the current effect of inflation.  At the time of a covered loss, your amount of house coverage will include any increases in the United States Consumer Price Index from the beginning of the policy period."  Ex. 3, at B-1; see Spagnola, 2007 WL 927198, at *3 ("the CPI applies to interim period adjustments").  Thus, if an insured incurs a total loss to his property six months into the Policy and the cost of reconstruction exceeds the stated amount of coverage, the CPI provision gives the insured, at no extra charge, a modest amount of extra coverage above the amount stated in the policy.

Spagnola.   Despite the fact that his complaint alleged that the Policy "leads the insured reasonably to believe that the change in [coverage] amounts at point of renewal will . . . [be] governed by the ["CPI"]," Ex. 51 ¶ 58, Mr. Spagnola testified that he never believed that that was true and did not think it would make sense to tie coverage increases to CPI because CPI addresses a "basket of consumer goods", whereas the Policy relates to the cost of reconstructing a home and are thus "different concepts." Ex. 2, at 152:8-22 (emphasis added).   On March 16, 2007, Mr. Spagnola again moved for class certification.   Spagnola, Dkt. No. 53.

On March 27, 2007, the Court rendered that motion moot by dismissing Mr. Spagnola's complaint in its entirety.   Spagnola, 2007 WL 927198 at *6.   In doing so, this Court rejected his claim that the Policy capped coverage increases by CPI, reasoning that the Policy was "not ambiguous" and "explicitly" states "that []Great Northern may increase coverage and premiums annually," that "the amount of such increases will 'reflect current costs and values,' [](defined as the 'reconstruction costs' on the same page, not the CPI[])," and that the Policy's reference to CPI related only to "interim period adjustments," which were not at issue here.   Id. at *3.

Mr. Spagnola appealed portions of the March 27, 2007 Opinion and Order to the Second Circuit but did not appeal the Court's holding that CPI did not govern annual inflation guard increases.[6]   During the pendency of that appeal, Mr. Spagnola's counsel filed a virtually identical complaint – this time in the name of his close friend, Mr. Bernstein.   Ex. 50.   By agreement, the district court stayed Mr. Bernstein's action pending the outcome of Mr. Spagnola's appeal.

On July 28, 2009, the Second Circuit affirmed the dismissal of Mr. Spagnola's five-count complaint with one exception.   Among other things, the Second Circuit affirmed dismissal of Mr. Spagnola's Section 3425 claim.   It held that Section 3425 permits an insurer to make annual increases "when the policy itself provides for such periodic increases," and that the Policy did so

---

[6]   Presumably, Mr. Spagnola did not appeal this Court's explicit rejection of the CPI interpretation asserted on his behalf because Mr. Spagnola had also rejected that interpretation in his deposition.   Ex. 2 at 152:2-153:2. Instead, Mr. Spagnola argued on appeal that this Court "ignored" his other claim that Great Northern breached the "current costs and values" provision of the Policy.   Ex. 53 to December 3, 2009 Declaration of Keara Gordon, at 26.

when it provided that the insurer "could condition annual renewal on the payment of increased premiums based on current 'costs and values.'"  Spagnola, 574 F.3d at 68, 70.  The Court rejected Mr. Spagnola's claim that the Policy had to specify the measure of the increase:

> That the increase cannot be specifically measured from the policy itself is not determinative.  As the district court wrote:  "[The particular policy at issue in this case] is designed to keep pace with inflation and prevent underinsurance, and therefore, does not and for the insured's protection, cannot specify" the amount of the future coverage increases in the original policy.

Id. at 70 (emphasis added).

The only claim the Second Circuit allowed to proceed was the claim that Great Northern allegedly breached the Policy by increasing coverage "in a way that did not reflect current costs and values."  Id. at 71.  The Court reviewed Beller v. William Penn Life Ins. Co. of New York, 8 A.D.3d 310, 778 N.Y.S.2d 82 (App. Div. 2004), in which an insured alleged that an insurer determined premiums on a basis different than the one required by the policy.  The state court concluded that such allegations, "if true, constituted a breach of contract."  Spagnola, 574 F.3d at 72 (citing Beller).  Relying upon Beller, the Second Circuit suggested that there was some unresolved "ambiguity of the term 'current costs and values'" and concluded that Mr. Spagnola's claim "met the standard necessary to resist" the defendants' motion to dismiss.  Id.

Following remand, this Court coordinated the Spagnola and Bernstein actions.  Mr. Spagnola withdrew his 2007 class certification motion and the parties conducted supplemental discovery[7] and new briefing on class certification.

In its January 7 Order, this Court denied class certification on the grounds that the plaintiffs failed, in numerous ways, to satisfy Rule 23(a)(4) and Rule 23(b)(3).  While the defendants had also argued that the plaintiffs could not meet the requirements of Rule 23(a)(2)

---

[7]   The parties previously conducted class discovery in the Spagnola litigation.  This Court allowed limited discovery specific to new issues raised by the Bernstein complaint, including supplemental written discovery, the defendants' deposition of Mr. Bernstein and the plaintiffs' deposition of Mr. Bernstein's broker.  It refused, however, to allow the plaintiffs' counsel to re-depose representatives of the defendants.  Spagnola Dkt. No. 71.

and (a)(3) because, among other things, they interpreted the key Policy term in very different ways, the Court found that the plaintiffs had "satisfied their burden to prove typicality and commonality – if only barely." Spagnola, 264 F.R.D. at 94 (emphasis added)[8] (also noting that the defendants' concerns "do give me some pause"). The Court acknowledged that the plaintiffs' "views of the meaning of the contract are antithetical to one other," but concluded that "whatever the contract meant, it had the same meaning with respect to all policyholders, and the final determination of that meaning does not depend on Plaintiffs' own subjective understanding." Id. Thus, the Court concluded that

> the claims at issue in this case bear at least two common questions: (a) the meaning of the term "current costs and values" and its relationship to CPI, and (b) whether the methodology that was actually used to raise coverage was permitted under the contract.

264 F.R.D. 76, 94-95.

The plaintiffs appealed the denial of class certification to the Second Circuit. After that appeal was fully briefed, the Supreme Court issued its decision in Dukes. Approximately six weeks later and three weeks before oral argument was scheduled, the Second Circuit vacated the January 7 Order and remanded the matter for further consideration in light of Dukes.

### III.   ARGUMENT

Under Dukes, the plaintiffs must: (1) affirmatively demonstrate that they satisfy Rule 23(a)(2)'s commonality requirement and; (2) to do so, they must identify at least one common question of law or fact that is both critical to establishing the defendants' liability for breach of contract and provable on a classwide basis. Dukes, 131 S.Ct. at 2551, 2556 (commonality

---

[8]   Both the Court and the defendants addressed commonality and typicality together because, "[a]s the Supreme Court has found, '[t]he commonality and typicality requirements of Rule 23(a) tend to merge.'" Spagnola, 264 F.R.D. at 93 at n.19 (citation omitted). While the Court found that the "Plaintiffs utter inability to arrive at a single theory of their cases" was not dispositive for purposes of commonality and typicality, it found that the plaintiffs' diverging interpretations of the contract reflected "upon their inability to serve as adequate representatives." 264 F.R.D. 76, 95, n.21. That holding is not altered by Dukes

requires that the plaintiff's claim "depend on a common contention…of such a nature that it is capable of classwide resolution").   Here, as in Dukes, that standard has not been met.

Unable to satisfy their burden of proving that their interpretation of the Policy can be established through classwide proof, the plaintiffs seek to divert attention from this issue by not only burying the threshold question of the Policy's interpretation at the end of their brief, but mischaracterizing the record to suggest that Great Northern has engaged in wrongdoing with respect to the Policy or the conduct of this case.  Without wishing to legitimize such tactics, the defendants note that the plaintiffs' claims and insinuations are without merit.  For example, the record reflects that Great Northern increases coverage at annual renewal through a careful and deliberate process.   Its appraisal department conducts contractor interviews and otherwise engages in a time-intensive and laborious study of construction costs in the relevant jurisdictions each year to arrive at certain factors which, when applied to each insured's home, are intended to increase coverage to "reflect current costs and values." See, e.g., Spencer Aff. ¶¶ 5, 9, 12-17.[9] The plaintiffs also engage in rank and improper speculation when they suggest that "[d]iscovery will show, we believe, that Marques consistently increased or rounded up the numbers". Plaintiffs' Memorandum of Law Respecting Second Circuit's Vacatur and this Court's Orders of September 22, 2011 ("Pl. Oct. 7 Br.") at 14 (emphasis added).  The plaintiffs proffer no proof as to the extent to which any estimates arrived at by the appraisal department may have ever been "increased or rounded up", or more significantly, that this occurred without a rational and legitimate reason.  The plaintiffs did not even attempt to solicit any of this information from Mr. Marques or Mr. Spencer at their depositions although they had the opportunity to do so.  And, to the extent the plaintiffs attempt to excuse their failure to satisfy their evidentiary burden under Rule 23 by claiming they were wrongfully denied discovery, this Court has already rejected this

---

[9]     The factors arrived at through this process may not be applied to every policy, however.  For example, where a home was appraised close in time to the renewal, the adjustment may not be made on the grounds that the appraisal adequately took into account any change in current costs and values.  Spencer Aff. ¶ 21.

argument.  See Spagnola, 264 F.R.D. at 91 (finding "Defendants did not wrongfully stymie Plaintiffs' discovery efforts . . ..")

### A.    Wal-Mart Stores, Inc. v. Dukes

In Dukes, three current and former Wal-Mart employees filed a putative class action on behalf of all current and former Wal-Mart female employees alleging that the company discriminated against them on the basis of their sex by denying them equal pay or promotions. 131 S. Ct. at 2547.  The plaintiffs did not claim that Wal-Mart had any express corporate policy of discrimination; rather, they claimed that local managers exercised their discretion in a discriminatory manner, and that Wal-Mart was aware of this practice but failed to stop it.  Id. at 2548.  To show commonality, the plaintiffs relied on:  (1) statistical evidence; (2) anecdotal reports of discrimination from approximately 120 female employees; and (3) a sociologist's analysis of Wal-Mart's culture and practices.  Id. at 2549.  With limited exceptions, the district court granted class certification and the Ninth Circuit largely affirmed.  Id. at 2549.

In decertifying the class, the Supreme Court held that the plaintiffs had failed to satisfy the threshold issue of commonality.  The Court began by noting that simply raising common questions is not sufficient.  Id. at 2551.  Instead, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury'"; their claims must  "depend upon a common contention" that is "of such a nature that is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Id. (quoting General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 157, 102 S.Ct. 2364, 2370 (1982) (emphasis added)). "'What matters to class certification,'" the Supreme Court wrote, "'is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'"  Id. at 2551 (citation omitted) (emphasis in original).  Merely alleging the class has suffered the same violation "gives no cause to believe that all of their claims can productively be litigated at once."  Id.

The Court also made clear that Rule 23 "does not set forth a mere pleading standard," but rather "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Id. (emphasis in original). And, "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied,'" and such "rigorous analysis" will "frequently" entail "some overlap with the merits of the plaintiff's underlying claim." Id.

In Dukes, the "crux of the inquiry" into each claim was the reason for the employment decision at issue. Id. And, critically, the Court found that the plaintiffs had not presented sufficient evidence to demonstrate that a common answer existed across the class. Id. ("Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question why was I disfavored.") (emphasis in original). In so finding, the Court rejected the plaintiffs' evidence as insufficient to demonstrate the existence of a general policy of discrimination that would tie together all of the putative class members' claims. Id. at 2556.[10] Thus, the plaintiffs failed to "establish[] the existence of any common question." Id. at 2556-57.

**B.      The Plaintiffs Did Not and Cannot Satisfy the <u>Dukes</u> Commonality Standard.**

In its January 7 Order, this Court concluded that there were two common questions: (1) "the meaning of the term 'current costs and vales' and its relationship to CPI," and (2) "whether the methodology that was actually used to raised coverage was permitted under the contract." Spagnola, 264 F.R.D. at 95. Now, after Dukes, it is clear that the plaintiffs did not and cannot demonstrate that either is answerable on a classwide basis.

---

[10]      The Court rejected the expert testimony that Wal-Mart's corporate culture made it "vulnerable" to gender bias on the grounds that it failed to indicate the magnitude of employment decisions that may have been affected by such bias – i.e., the "essential question on which [plaintiffs'] theory of commonality depends." Id. at 2553-54. The Court also found evidence regarding disparities at the regional and national level failed to demonstrate commonality because, among other things, such data "cannot by itself establish the uniform, store-by-store disparity upon which the plaintiffs' theory of commonality depends." Id. at 2555. And, particularly given the size and scope of the proposed class, the Court rejected anecdotal evidence of discrimination as statistically insignificant. Id. at 2556.

**1.      As Framed by the Plaintiffs, The Central Question of the Policy's Interpretation Is Not Susceptible to Classwide Proof.**

The threshold question underlying the plaintiffs' claim is the meaning of the Policy provision that permits Great Northern to increase coverage at annual renewal "to reflect current costs and values."   In concluding that this question was a common one, this Court previously reasoned that "whatever the contract meant, it had the same meaning with respect to all policyholders, and the final determination of that meaning does not depend on Plaintiffs' own subjective understanding."   Id. at 94.  While this statement might be an accurate statement of law in the ordinary breach of contract case, it cannot be used here to establish commonality.

Here, the claim at issue defies common proof.  To begin with, this not a case where, as required by Dukes, the plaintiffs even assert a "common contention."[11]  Quite the opposite, the plaintiffs' testimony makes clear that they both interpret the Policy in very different ways:

| Mr. Spagnola's testimony | Mr. Bernstein's testimony |
|---|---|
| Mr. Spagnola testified that he never understood that annual increases would be tied to CPI, nor did he believe it would make sense to do so:<br><br>Q.  Do you have any understanding how, if at all, the Consumer Price Index relates to your insurance coverage?<br><br>A.  I don't believe it does . . .  [M]y policy relates to replacement cost, whereas my understanding of CPI is the increase in the price of a basket of consumer goods is how they determine that inflation, so it's different concepts . . . .<br><br>Q.  Okay.  So have you ever understood that your insurance coverage would be increased by the Consumer Price Index?<br><br>A.  No.          Ex. 2, at 152:02-153:2. | Mr. Bernstein, by way of marked contrast, testified that he always understood that his policy would only be increased by CPI:<br><br>I understood that when I bought the policy that the coverage was based on an appraisal or it was based on the Consumer Price Index.<br><br>Ex. 1, at 13:12-15.<br><br>…I thought it was very clear that Chubb could only increase the cost on one of two bases:  Either A, an appraisal of the property; or B, the CPI.  And if they increased it without doing an appraisal, it had to be based entirely on the CPI.  That was my understanding of the policy.  Id. at 82:13-20. |

---

[11]       Nor, as required by Dukes, have the plaintiffs suffered the "same injury."  Indeed, Mr. Bernstein suffered no injury at all.  When he switched insurers for reasons unrelated to this case, Mr. Bernstein's new insurer told him that the stated coverage amount on his Great Northern Policy was too low.  See Ex. 43.  Thus, although plaintiffs claim that Great Northern was overinsuring his property, the record demonstrates the exact opposite was true.

Moreover, the plaintiffs explicitly have taken the position that the Policy is ambiguous (i.e., susceptible to different, but reasonable, interpretations),[12] and, in support of their claim, have pointed to extrinsic evidence unique to each of them.[13]   Under these circumstances, the plaintiffs' arguments not only fail to demonstrate that their claim can be proven on a classwide basis, they compel the conclusion that it cannot.

To be more specific, the plaintiffs have advanced two alternative interpretations:

> (1) that the Policy required Great Northern to increase coverage at renewal based on the CPI (an interpretation this Court and Mr. Spagnola have already rejected); and

> (2) that the Policy required Great Northern to increase coverage at renewal based on an analysis of the particulars of each insured's property (i.e., an interpretation to which no putative class member clearly subscribes).

See, e.g., Pl. Oct. 7 Memo" at 9.  See also Spagnola, 574 F.3d at 71 ("According to Spagnola, the policy could reasonably be interpreted to base costs and values on either actual reconstruction costs or the CPI").  Putting aside the substantive flaws inherent in each interpretation, neither can be supported by reference to evidence common to the class as a whole and, tellingly, the plaintiffs point to none.  Accordingly, class certification is improper.

### a.        Plaintiffs' CPI Theory Is Not Susceptible to Classwide Proof.

Throughout this case, the plaintiffs have never explained how they would purport to prove their CPI interpretation of the contract on a classwide basis.  They cannot.

The plaintiffs' (or more accurately Mr. Bernstein's) contention that the Policy required annual increases to be measured by CPI is based, in part, on the fact that CPI is mentioned in a paragraph of the Policy that applies only if the insured suffers an actual loss and deals not with annual increases, but interim adjustments made during the year-long period between annual

---

[12]    See Pl. Cert. Memo. at 2 ("To the extent that the term 'current costs and values' is, as the Circuit noted, of ambiguity . . .."); id. at 3-4 (arguing defendants "utilitized an ambiguous, apparently indeterminate and wholly opaque, term to obscure and conceal its unlawful practice").

[13]    See Pl. Oct. 7 Memo 17-18 ("Extrinsic evidence" is "plainly important for construing the term").

renewals.  <u>See</u> Ex. 3, at B-1 (house) and C-1 (contents) and note 5, <u>supra</u>.  CPI, however, reflects

the effects of rising costs on a basket of consumer goods such as milk and clothing.  Spencer Aff.

¶ 18.  It does not take into account the cost of labor or other construction costs that affect the cost

of reconstructing a home and thus, it would make no sense to cap annual coverage increases to

this index.  <u>Id</u>.  As such, this Court previously rejected the contention that the Policy should be

construed in this matter and found that the Policy:

> explicitly notifies the insured that (1) Great Northern may increase
> coverage and premiums annually (Policy at B-1), (2) the amount of
> such increases will "reflect current costs and values," (<u>Id</u>.) (defined
> as the "reconstruction" costs on the same page, not the CPI (<u>Id</u>.)), .
> . . and (5) the CPI applies to interim period adjustments (<u>Id</u>. at B-
> 1).

<u>Spagnola</u>, 2007 WL 927198, at *3.  The plaintiffs did not appeal that decision, but rather, argued

to the Second Circuit only that this Court overlooked their separate claim that Great Northern did

not increase coverage to "reflect current costs and values."  Ex. 53 to December 3, 2009 Gordon

Decl.  Suggesting that there was some "ambiguity of the term 'current costs and values,'" the

Second Circuit reversed the dismissal of that branch of the breach of contract claim.  <u>Spagnola</u>,

574 F.3d at 72.

    Thus, assuming that the plaintiffs' CPI interpretation is even plausible (and, as this Court,

Mr. Spagnola and the defendants have previously noted, it is not), the Policy is, at best,

ambiguous.[14]  And, where a contract term is ambiguous, New York law provides that extrinsic

evidence is admissible to determine what each party intended when it entered the Policy.  <u>Seiden</u>

<u>Assocs., Inc. v. ANC Holdings, Inc.</u>, 959 F.2d 425, 430 (2d Cir. 1992) (where a contract is

ambiguous, "an opportunity to present extrinsic evidence must be afforded to establish what the

original contracting parties intended").  <u>See also</u> <u>Parks Real Estate Purchasing Grp. v. St. Paul</u>

---

[14]    Even the plaintiffs have never argued that the Policy <u>unambiguously</u> required Great Northern to base
annual increases on CPI  <u>See</u>, <u>e.g.</u>, Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss,
<u>Spagnola</u> Dkt. No. 39, at 10-13 (characterizing the CPI claim as one for "ambiguous" breach of contract).  <u>See also</u>
<u>Spagnola</u>, 574 F.3d at 71 ("According to Spagnola, the policy could reasonably be interpreted to base costs and
values on either actual reconstruction costs or the CPI.").

Fire & Marine Ins. Co., 472 F.3d 33, 43 (2d Cir. 2006) (if insurance provision is ambiguous, extrinsic evidence is admissible "to ascertain the meaning intended by the parties during the formation of the contract"); Foot Locker, Inc. v. Omni Funding Corp. of America, 78 A.D.3d 513, 515, 911 N.Y.S.2d 344, 345-46 (N.Y. App. Div. 1st Dept. 2010) (affirming denial of summary judgment where lease was susceptible to more than one interpretation, and therefore, extrinsic evidence was "necessary" "to determine the parties' intent").  If the plaintiffs persist in pursuing their CPI theory, individualized inquiries as to each class member's intent in purchasing the Policy are necessary, as is the introduction of extrinsic evidence, such as communications that each insured had with his or her broker regarding the Policy and its coverage.

Mr. Spagnola's deposition demonstrates why such individualized inquiries are required. Regardless of what may or may not have been said to him by his broker or anyone else, Mr. Spagnola cannot prove that he expected the contract to limit annual increases to CPI because he explicitly testified that he never understood that the Policy would operate in that fashion (nor did he think it would make sense to do so).[15]  If the plaintiffs are allowed to pursue their claim that the Policy could reasonably be interpreted to limit coverage increases by CPI, Great Northern is entitled to determine whether any class members actually interpreted the Policy in that manner or whether – like Mr. Spagnola – they did not.

Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023 (8th Cir. 2010), is particularly instructive here.  In that case, purchasers of fixed deferred annuities brought a putative class action against the seller alleging, among other things, breach of contract.  The relevant policy language set a guaranteed rate and provided that "[f]rom time to time, interest greater than the guaranteed rate

---

[15]     After Mr. Spagnola explicitly rejected the interpretation of the Policy being advanced on his behalf, the plaintiffs attempted to control the damage to their case by arguing that his subjective interpretation of the Policy is irrelevant.  Pl. Cert. Memo. at 2, 19-20, 24 and 25.  That argument fails under the circumstances of this case.  If Mr. Spagnola were arguing that the Policy was unambiguous, then his subjective interpretation might be irrelevant.  If Mr. Spagnola were attempting to advance the CPI interpretation and testified that he always believed the Policy tied annual increases to CPI, but never articulated that belief to Great Northern, his subjective interpretation also might be irrelevant because it would not be probative of whether there was a meeting of both parties' minds on that point.  However, since Mr. Spagnola explicitly rejected an interpretation being advanced on his behalf, that admission is indisputably relevant to show that the parties could not have intended the Policy to mean CPI.

may be credited in a way set by our Board of Directors.  There may be more than one interest rate in effect at any time."  Id. at 1026.  The plaintiffs argued that the defendant breached this language by failing to credit nonguaranteed interest in a single way (but instead treating newer deposits differently than older deposits) and also by failing to have the board of directors "'set'" the way that the non-guaranteed interest would be credited.  Id. at 1029-30.

The district court denied class certification and the Eighth Circuit affirmed.  With respect to the plaintiffs' contract claim, the Court noted that "it is not clear that any members of the putative class, let alone a substantial number of them, originally understood the contract language in the manner that the [plaintiffs] now propose."  Id. at 1030.  Further, it noted that the plaintiffs' interpretation was at least subject to reasonable dispute since, as here, the provision at issue could also reasonably be interpreted to give the defendant discretion over how to credit interest and did not require that it use a single approach or that the Board do anything more than ratify the method in some manner.  Id.  Assuming the plausibility of the plaintiffs' interpretation, the court noted that "the existence of two or more reasonable interpretations opens the door for extrinsic evidence about what each party intended when it entered the contract."  Id. (citations omitted).  Such evidence would include not only that relating to the defendant's intent, but also "evidence about how the contract was explained in various sales discussions and whether each purchaser's understanding of the contract was consistent with the theory the [plaintiffs] now advance."  Id.  Thus, the Court concluded that the defendant's "liability to the entire class for breach of contract cannot be established with common evidence."  Id.  See also Adams v. Kansas City Life Ins. Co., 192 F.R.D. 274, 282 (W.D. Mo. 2000) (denying motion for class certification because the need to consider extrinsic evidence to interpret ambiguity in insurance contract rendered the plaintiff's claim for breach "individualized" and the proposed class action "unmanageable").  The same conclusion follows here.

Under the unique circumstances of this case, the plaintiffs cannot prove their claims via classwide proof.  Indeed, in support of their claim that the Policy required Great Northern to

limit annual increases to CPI, the plaintiffs point to:  a statement made by a GEICO representative to Mr. Spagnola <u>five years after he purchased his Policy</u>, Ex. 15 at 1; Pl. Oct. 7 Memo at 17; and testimony by Mr. Bernstein's broker regarding his understanding of the Policy. Pl. Oct. 7 Memo at 17.  <u>See</u> <u>also</u> Ex. 1 at 13:12-21 (Bernstein testimony regarding reliance on his agent).[16]  Assuming these statements are relevant, what Mr. Spagnola and Mr. Bernstein may or may not have been told individually about <u>their</u> Policies reveals nothing about what <u>other</u> class members were told individually about <u>their</u> Policies.  Contrary to plaintiffs' claim, statements made to two insureds do not constitute "strong" evidence of what was said to "the world"; rather, these statements beg the <u>highly individualized</u> question of what every other class member was told, and when and how, if at all, it affected each class member's understanding of the Policy. <u>Cf.</u> <u>Dukes</u>, 131 S. Ct. at 2556 (finding plaintiff's "anecdotal evidence" was "too weak to raise any inference" of classwide discrimination); <u>id</u>. at 2556, n.9 ("when the claim is that a company operates under a general policy of discrimination, a few anecdotes selected from literally millions of employment decisions prove nothing at all").[17]

---

[16]    The plaintiffs have also argued that this Court should resolve any ambiguity in the Policy against the defendants as the drafters of the Policy pursuant to the theory of <u>contra</u> <u>proferentum</u>.  <u>See, e.g.</u>, Pl. Cert. Memo. at 2; <u>id</u>. at 10.  <u>Contra</u> <u>proferentum</u>, however, is a rule of <u>last resort</u> and applies only <u>after</u> the Court has concluded that extrinsic evidence cannot resolve the ambiguity.  <u>See</u> <u>Haber v. St. Paul Guardian Ins. Co.</u>, 137 F.3d 691, 697 (2d Cir. 1998) (finding that review of extrinsic evidence of the intentions of the parties to a standard form homeowners' insurance policy did not conclusively resolve the ambiguity at issue, and only then, resorting to the reasonable expectations doctrine and the <u>contra</u> <u>proferentum</u> rule to construe ambiguity in favor of coverage); <u>see</u> <u>also</u> <u>In re</u> <u>Prudential Lines</u>, 158 F.3d 65, 77 n.6 (2d Cir. 1998) (<u>contra</u> <u>proferentum</u> applies only as "last resort" when ambiguities cannot be resolved by review of extrinsic evidence).  And, in any event, the plaintiffs fail to explain how this rule would aid the Court in choosing between the <u>plaintiffs</u>' two alternative theories.

[17]    The plaintiffs have also argued that the defendants should be estopped from relying on any interpretation of the Policy other than CPI based on their contention that the GEICO representative and Mr. Bernstein's broker were the defendants' agents.  Putting aside the dubious merits of this claim, their estoppel argument still fails because it would require individual inquiries to determine first what each class member was told, and second whether each class member relied on any statement in deciding whether to renew.  "To establish an estoppel, a party must prove that it relied upon another's actions, its reliance was justifiable, and that, in consequence of such reliance, it prejudicially changed its position."  <u>Town of Hempstead v. Incorporated Vill. of Freeport</u>, 15 A.D.3d 567, 570 (N.Y. App. Div. 2d Dep't 2005).  <u>See also</u> <u>McManus v. Bd. of Educ. Of Hempstead Union Free School Dist.</u>, 87 N.Y.2d 183, 186-87 (1995) (applying the principle that "'estoppel' is a bar which precludes a party from denying a certain fact or state of facts exists to the detriment of another party who was entitled to rely on such facts and had acted accordingly" to his or her detriment).  Here, the record shows that Mr. Spagnola did not rely on a statement that this term means CPI in making his renewal decisions.  Such evidence is sufficient to undercut the plaintiffs' argument that commonality can be satisfied even on an estoppel theory.  <u>See</u> <u>Haynes v. Planet Automall, Inc.</u>, 2011 WL 3555613 at *13 (E.D.N.Y. Aug. 12, 2011) (holding that evidence of at least three instances where an allegedly

Because of the unique facts of this case, the plaintiffs fail in their attempt to analogize it to other cases in which courts have found commonality post-Dukes.   See Gray v. Hearst Commc'ns, Inc., 2011 WL 3734413 (4th Cir. 2011); Trombley v. Bank of America, 2011 WL 3273930 (D. R.I. July 29, 2011); Jermyn v. Best Buy Stores,  2011 WL 433664 (S.D.N.Y. Sept. 15, 2011).   None of those cases involves a breach of contract claim where the named plaintiffs disagree as to the contract's meaning and where the plaintiffs' claim would require resort to extrinsic evidence to resolve that issue.   See, e.g., Trombley, 2011 WL 3273930, at *3 (finding commonality established where plaintiffs alleged breach of an implied covenant of good faith and fair dealing).   Gray is inapposite because the plaintiff's contract and other claims each "ultimately hinge[d] on whether he can establish a distribution obligation" and, significantly, the defendant in that case conceded this issue.   2011 WL 3734413, at *1, *2.   See also id. at *3 ("unlike Wal-Mart, there is no dispute that a uniform policy (or obligation) exists or that such a uniform policy applies to all plaintiffs; White Directory concedes both").

Similarly, in Jermyn, the plaintiffs alleged a "specific, illegal corporate policy rendering Defendants liable to all class members" and presented "significant (indeed ample proof) that the illegal policy alleged in fact existed." 2011 WL 4336664, at *6.   Here, by way of contrast, the plaintiffs have not offered any proof that their interpretation of the Policy can be established on a classwide basis.   Moreover, the Jermyn Court adopted a very narrow reading of Dukes that is not consistent with many courts that have found Dukes applicable outside the employment context. See, e.g., Gray, 2011 WL 3734413; Engel v. Scully & Scully, Inc., 2011 WL 4091468 (S.D.N.Y. Sept. 14, 2011) (applying Dukes in case brought under Fair and Accurate Credit Transactions Act); Salon Fad v. L'Oreal USA, Inc., 2011 WL 4089902 (S.D.N.Y. Sept. 14, 2011) (applying Dukes in case alleging false advertising and unfair competition).   In any event, even if Judge

---

unlawful fee was charged to cash customers, albeit small, was "fatal to plaintiff's commonality argument" that defendants employed a systematic, uniform, and illegal policy of charging this fee only to credit customers).

McMahon did not believe <u>Dukes</u>' commonality analysis had any bearing on the <u>Jermyn</u> case, the Second Circuit's August 9, 2011 mandate strongly suggests that <u>Dukes</u> is relevant here.

> **b.    Plaintiffs' Alternative Policy Interpretation Is Not Susceptible to Classwide Proof.**

In the alternative and in complete contrast to their CPI interpretation, the plaintiffs argue that the term "to reflect current costs and values" required Great Northern to increase coverage at annual renewal by reference to the particularized costs and values of each class member's individual property.  <u>See</u> Pl. Oct. 7 Memo at 9.  According to the plaintiffs, this requires either reference to the actual reconstruction costs of each insured's property or something substantially similar to an appraisal of each class member's property.  <u>See id</u>. at 9 and 13.    Again, the plaintiffs have not demonstrated how this interpretation can be shown through classwide proof.

The plaintiffs do not argue that the Policy unambiguously required Great Northern to do an individualized appraisal of each insured's property at renewal each year.  Nor can they.  Any such interpretation is not reasonable because the Policy provides that Great Northern "may change [the coverage amount] when appraisals are conducted <u>and</u> when the policy is renewed, to reflect current costs and values."  Ex. 3, at B-1 (emphasis added).  By suggesting that Great Northern was required to engage in an appraisal-like process in adjusting coverage at annual renewal, the plaintiff would render superfluous the express provision that also allows Great Northern to make coverage adjustments when an appraisal is done.  <u>See</u> Restatement 2d Contracts § 203, cmmt. b ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous," and therefore, "an interpretation is very strongly negated if it would render some provisions superfluous"); <u>see also</u> <u>Bruckmann, Rosser, Sherrill & Co., L.P. v. Marsh USA, Inc.</u>, 87 A.D.3d 65, 70, 926 N.Y.S.2d 471, 475 (N.Y. App. Div. 1st Dept. 2011) (rejecting intepretation that would render other terms in an insurance contract "superfluous and without meaning"; "[c]ourts are obliged to interpret a contract so as to give meaning to all of its terms").

Moreover, the plaintiffs do not point to any extrinsic evidence, much less any that would suggest their interpretation is susceptible to classwide proof.[18]   Regardless, if the plaintiffs persist in arguing that the Policy should be interpreted to require Great Northern to take a particularized reassessment of each insured's property at annual renewal, the defendants should be allowed to determine if any class member actually interpreted the Policy in this manner.

To the extent the plaintiffs claim that Great Northern breached the Policy by setting contents coverage as a percentage of house coverage and then maintaining that relationship upon renewal, that claim is a corollary of their claim that the Policy should be interpreted to require a reassessment of the specific characteristics of each insured's property at annual renewal.[19]   In other words, the plaintiffs appear to claim that contents coverage had to be set by analyzing the particular contents of each insured's home.   This interpretation is not tenable because it would require insurers to inventory the entire contents of each insured's home, not only upon the Policy's issuance, but each year it is renewed.   It should have been obvious to each insured that this time-consuming and invasive study never occurred and that contents coverage was 50 percent of house coverage; as a result, no insured could reasonably have understood the Policy to

---

[18]     In support of this alternative Policy interpretation, the plaintiffs appear to rely exclusively on an excerpt of the Second Circuit's 2009 opinion which affirmed the dismissal of Mr. Spagnola's Section 3425 claim.   As the Court noted, it was undisputed that Section 3425 "permits an insurer to increase coverage limits (and therefore premiums) when the policy itself provides for such periodic increases."' 574 F.3d 64, 68.   Mr. Spagnola, however, contended that the Policy did not qualify for this exception under Section 3425 on the theory that "the insured cannot look to the policy itself to determine the amount of an increase which could be subject to the 'whim' of the insurer."   Id.   Rejecting Mr. Spagnola's contention, the Second Circuit relied on a New York Insurance Department opinion that sanctioned an increase "tied to a provision in the policy which required the insured to maintain coverage equal to the appraised value of the property."   Id. at 69.   Describing such a policy provision as "substantially similar" to the Policy provision in this case, the Court concluded that the fact that the increase "cannot be specifically measured from the policy itself is not determinative[;]" rather the opinion suggested that "the determinative factor . . . is whether the policy contemplates a periodic change in the policy's coverage or terms."   Id. at 70.   In other words, like "appraised value," the Court found "current costs and values" was a "sufficient mechanism to provide the insured notice that the coverage amount will change on a periodic basis."   Id. at 70.   To the extent plaintiffs pluck this statement out of context and contend the Second Circuit was opining as to the proper interpretation of the Policy, they are overreaching.   Notably, this is not the first time the plaintiffs have attempted to mischaracterize the Second Circuit's opinion in an effort to support their quest for class certification.   See Spagnola, 264 F.R.D. at 94 n.20 (rejecting as "far-fetched" and "inexplicabl[e]" plaintiffs' attempt to "bootstrap the Second Circuit's decision on an appeal of the dismissal of Spagnola's Complaint into a finding of typicality").

[19]     Ironically, the plaintiffs' claim that Great Northern breached the Policy by increasing house and contents coverage at the same rate is completely inconsistent with their CPI theory which posits that house and contents coverage should both be governed by the same rate – i.e., CPI.

operate otherwise.  See Ex. 2, at 103:05-23 (Spagnola testifying that he understood his contents coverage was set as a percentage of house coverage).  At a minimum, the Policy is, at best, ambiguous.  Thus, again, extrinsic evidence would be relevant, such as insureds' discussion with brokers.  Spencer Aff. ¶¶ 22 and 23.  See also Pl. Cert. Memo., Ex. E., Tab 1 at 18:2-22 (broker testimony regarding this being industry practice).  Accordingly, this interpretation is not susceptible to classwide proof.

> **2.    Whether Great Northern's Methodology Breached the Policy is Not a "Common Question" Susceptible to Classwide Proof.**

Because the plaintiffs cannot prove their interpretation of the Policy on a classwide basis, it necessarily follows that they cannot prove breach of the Policy via classwide proof.  Further, even assuming arguendo that the Policy language were susceptible to classwide interpretation, a number of factors preclude classwide proof of its breach.  Among other things, the record evidence shows that Great Northern did not automatically apply an annual coverage adjustment to each insured's Policy, but rather whether any such adjustment was applied might depend on facts such as when the insured's property had last been appraised and whether the insured contested the annual adjustment.  See Spencer Aff. ¶¶ 21, 24-27; see also Pl. Cert. Memo., Ex. E, Tab 1 at 27:11-23 (Bernstein's broker testifying that if an insured objected to the amount of increase, "sometimes" the insurer would change it and "sometimes" they would not).

## IV.    CONCLUSION

For all of the foregoing reasons, the defendants respectfully submit this Court should revise its January 7 Order and find that the Plaintiffs fail to satisfy Rule 23(a)(2).

Dated:  New York, New York.
       October 25, 2011

                                       Respectfully submitted,


                                       By:_____/s/ Keara M. Gordon_____
                                         Joseph G. Finnerty III
                                         Keara M. Gordon
                                         DLA Piper LLP (US)
                                         1251 Avenue of the Americas
                                         New York, New York 10020
                                         Telephone:   (212) 335-4500
                                         Facsimile:    (212) 335-4501

                                         Sara Z. Moghadam (admitted pro hac vice)
                                         DLA Piper LLP (US)
                                         500 8th Street, NW
                                         Washington, DC 20004
                                         Telephone:  (202) 799-4000
                                         Facsimile:  (202) 799-5512

                                       *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October 2011, a true and correct copy of the

foregoing was served by electronic case filing on:

        Roger W. Kirby
        Edward M. Varga, III
        Andrew M. McNeela
        KIRBY McINERNEY LLP
        825 Third Avenue, 16th Floor
        New York, NY  10022

        *Counsel for the Plaintiffs*

                    /s/ Keara M. Gordon
                    Keara M. Gordon